Bland Casket Company and Charles Worley, Treasurer of the State of Tennessee, Plaintiffs in Error,

*v.*

Vallie W. Davenport, Defendant in Error.

427 S.W.2d 839.

(*Nashville,* December Term, 1967.)

Opinion filed May 6, 1968.

H. T. FINLEY, Nashville, PARKER & NICHOL, of counsel, for plaintiffs in error.

GEORGE F. McCANLESS, Attorney General, and C. HAYES COONEY, Assistant Attorney General, Nashville, for Charles Worley, Treasurer.

VESTER NEAL AGEE, Lebanon, for defendant in error.

MR. JUSTICE HUMPHREYS delivered the opinion of the Court.

This is a Workmen's Compensation appeal. Davenport, an employee of Bland Casket Company was awarded permanent and total disability benefits, with fifty per cent to be paid by Bland Casket Company, his employer, and fifty per cent to be paid from the Second Injury Fund. The Company and the Treasurer have appealed assigning errors.

The trial judge filed a memorandum with which, after reading and studying the record, we find ourselves in

agreement in all particulars, except one which we shall mention. This memorandum is as follows:

"The petitioner, Vallie W. Davenport, filed his petition against Bland Casket Company, Inc., and Charles Worley, State Treasurer and custodian of the Second Injury Fund, in the Criminal Court of Wilson County, Tennessee, on March 15, 1967, under the Workmen's Compensation Law of the State of Tennessee.

"The petitioner alleged that he suffered an accidental injury while in the scope of his employment as a truck driver for the defendant, Bland Casket Company, on January 13, 1966.

"The petitioner averred that as a result of said accidental injury he is totally and permanently disabled and that he had previously, on August 2, 1955, and on February 19, 1962, been injured in the scope of his employment while working for the O. K. Trucking Company of Cincinnati, Ohio, and that in each case he had been awarded a rating of twenty-five (25%) percent and ten (10%) percent, respectively, permanent partial disability in the two cases, and had been paid accordingly.

"The defendant, Bland Casket Company filed an answer on May 27, 1967, in which they admitted that the petitioner suffered an accident while within the scope of his employment on January 13, 1966, that the defendant received due notice of same, and that the petitioner received Workmen's Compensation benefits at the rate of $38.00 per week.

"Honorable Charles Worley, State Treasurer, filed an answer, in which he denied that the petitioner was entitled to any compensation to be paid out of the Second

Injury Fund, and denied that the petitioner was permanently and totally disabled.

"This Workmen's Compensation case was tried in the Criminal Court of Wilson County, Tennessee, on June 2, 1967, and taken under advisement in order to allow counsel to prepare and file briefs.

"After consideration of the briefs filed by counsel for the petitioner and counsel for the defendant, the Court made the following finding of fact and conclusions of law.

"The petitioner, Vallie W. Davenport, employee, and the defendant, Bland Casket Company, Inc., employer, were operating under the Workmen's Compensation Law of Tennessee and subject to its provision. That Vallie W. Davenport was the employee of an employer who has properly insured his workmen's compensation liability.

"Petitioner, Vallie W. Davenport, began his employment with the Bland Casket Company, Inc., at Lebanon, Tennessee, in September, 1965. He worked for the defendant company as a truck driver delivering caskets, until the date of the injury which occurred on January 13, 1966. On that date the petitioner suffered an accidental injury while delivering a casket for his employer to a funeral home at Dalton, Georgia, at which time he was accidentally pushed off a porch and fell across some trash cans and a casket fell on top of him. The casket was removed from off the petitioner and he was removed from the trash cans and laid on a ramp. A few minutes thereafter he became nauseated and was taken to the doctor by ambulance. Dr. L. C. Yeargin of Dalton, Georgia, examined him and gave him some medicine and advised him to go to a motel and go to bed. The peti-

tioner notified his employer and then went to the motel where he spent the night. On the following day, the employer, Bland Casket Company, sent another employee to bring the truck and the petitioner back to Lebanon, Tennessee. The petitioner was subsequently seen by Dr. A. T. Hall, a general practitioner, who later referred the petitioner to Dr. C. C. McClure, a neurological surgeon. Dr. McClure diagnosed the petitioner's condition as two ruptured discs in the low back, being the fifth lumbar on the left and the fourth lumbar on the right. The petitioner is now permanently and totally disabled, according to the testimony of Dr. C. C. McClure, which testimony, at pages 11 and 12 of his deposition, is as follows:

'Q. In other words, he still had the two ruptured discs?

A. I felt that he did, yes sir.

Q. Doctor, without this operation that you've mentioned, assuming that the condition he was in at the time you saw him on August 12th, do you have an opinion as to what his disability was at that time?

A. I felt that he was totally disabled as far as any manual labor of any kind was concerned.

Q. Doctor, is that disability permanent in the absence of an operation, in your opinion?

A. Yes, sir.

Q. Doctor, as far as any employment that requires stooping, lifting, bending or standing on his feet, will he ever return to any type of work that requires any of that?

A. It could be done, but it would be extremely painful.

Q. In other words, doctor, would he be able to do any type of work that required him to stand on his feet extended periods of time, or bending, lifting, stooping or anything of that sort?

A. Well, as I say, physically, it could be done, but it would be extremely painful to do so.

Q. Well, would the pain be so severe that he couldn't do it, in your opinion?

A. I don't see how he could, no sir—I sure don't.

Q. In other words, doctor, would or not it be your opinion that, in the absence of the operation, that he would be permanently and totally disabled?

A. Yes, sir.

Q. Doctor, do you have an opinion, based on a reasonable degree of medical certainty as to what caused the two ruptured discs, or the two protruding discs in Mr. Davenport's back?

A. Yes, sir.

Q. What is that opinion, doctor?

A. This fall into the trash can with the casket on him.

Q. Doctor, do you know whether your bill has been paid or not

A. It has not.

Q. What is your bill, please, sir?

A. Two Hundred Dollars.

Q. Doctor, was all that bill incurred prior to January 13, 1967?

A. Yes, sir.'

"The claim was accepted as compensable and compensation was paid to the petitioner at the rate of $38 per week. It was admitted by the Answer that petitioner's wages were sufficient to entitle him to the maximum weekly rate.

"Prior to this accident and injury of January 13, 1966, the petitioner had sustained two other injuries, one being an injury received August 2, 1955, to his low back and right shoulder while working for the O. K. Trucking Company of Cincinnati, Ohio, for which injury petitioner was awarded twenty-five (25%) percent permanent partial disability and paid the amount of $1,610.00. February 19, 1962, while employed by the same O. K. Trucking Company, petitioner sustained a fracture of the left foot, being 'fracture of the tarsal and narricular bone of the left foot, as a result of which he was awarded a ten (10%) percent permanent partial disability as shown by Exhibit B to the original petition in this cause, and likewise being Exhibit — to the direct testimony of the petitioner.'

"At the time of the injury of January 13, 1966, at Dalton, Georgia, while helping to carry a casket and immediately thereafter, the petitioner suffered severe pain between his shoulders that seemed to start from the back up to the head. He suffers from awful headaches and cannot sit, stand or lie down for a long time. While sitting he is in pain and in a twist. His left leg stays numb, and the pain runs from the lower back down into the calf of the left leg and sometimes the pain runs up to the head. The petitioner describes it as 'feels like a hot iron.' The petitioner is compelled to wear a brace

of a corset type, laced and with perpendicular stays of plastic, metal or wood. The petitioner stated he did not know of anything he can do to make a living. The petitioner, Vallie W. Davenport, is 48 years of age and has a wife and a family. All of his children are grown, except the youngest boy, who is three years of age. Dr. McClure, after his examination, recommended an operation, known as a laminectomy Dr. McClure's findings as a result of his examination, pages 7 and 8 of his deposition, are as follows:

'Q. Well, in any event, did he say who he was working for at that time?

A. Yes, sir, the Bland Casket Company.

Q. Doctor, would you please give us your findings on that examination?

A. His vital signs, that is, the blood pressure and so on, were within normal limits. He had tenderness over his eighth thoracic spinous process, that is, up in the chest portion of the spine, and also the fifth lumbar spinous process. This is the lowest movable vertebra in the back. He was not showing any muscle spasm at that time. He was walking with a lisp to the right—there was pain on straight leg raising on the right somewhat worse than the left, although it was present bilaterally. He had a sensory disturbance, which was somewhat peculiar because it involved both lower extremities following the fourth lumbar dermatome on the right and the first sacral dermatome on the left. He had weakness of plantaflexion on the left, that is, pushing the foot down, and weakness of dorsiflexion of the right foot, pulling the foot up. There were no reflex changes. I made x-rays of his dorsal spine and

also of his lumbar spine and the dorsal spine x-rays were within normal limits. The lumbar spine x-rays showed a rather marked narrowing of the fifth lumbar interspace and a slight narrowing of the fourth lumbar interspace.

Q. Doctor, what was your diagnosis at that time?

A. I felt that he had two protruded discs at the fifth lumbar on the left and at the fourth lumbar on the right.

Q. Doctor, when was the next time you saw Mr. Davenport?

A. On the 6th of May, '66.

Q. What was his condition at that time, doctor?

A. As far as his low back was concerned, the condition was just about identical with that of March 16th.

Q. Now, is that in connection with the fourth and fifth lumbar discs?

A. Yes, sir, that is. He was, in addition, complaining with his neck at that time, but I found no difficulty either neurologically or radiographically to account for his neck pain.

Q. Doctor when was the next time you saw Mr. Davenport?

A. On the 12th of August, '66.

Q. What were your findings at that time?

A. Again, there was absolutely no change in his condition. He was complaining with his back, hip, leg and

his examination was identical. I felt still that nothing short of surgery was going to give him relief.

Q. Did you recommend surgery, doctor?

A. Yes, sir, I did.

Q. What type of surgery did you recommend?

A. A laminectomy, removal of these two discs.

Q. Doctor, is that considered a major operation?

A. It's major surgery, yes, sir.''

There is a dispute between the petitioner and the defendant as to whether or not the petitioner refused to submit to an operation which might to some extent have corrected his disability. The petitioner testified that at the time of, or immediately after Dr. C. C. McClure examined him that he agreed for an operation, but thereafter he was not able to get assurance that the operation would be paid for by the defendant or the insurance and that there was so much delay before the defendant company finally tendered an operation that, according to Dr. McClure's advice, his chances for a favorable result had considerably diminished and that, according to Dr. McClure's advice, he had only a 50-50 chance of a successful operation. Dr. C. C. McClure described the operation procedure as follows: (Dep. of Dr. C. C. McClure, pages 9 and 10).

''Q. Doctor, I believe you stated a minute ago that you had recommended an operation, would you briefly tell us the medical procedure for this type of operation— what has to be done?

A. Well, this is usually done under a spinal anesthetic, although it may be done under a general—it is more

satisfactory with a spinal. Of course, there has to be an incision made in the skin over the area portion of the spine. In Mr. Davenport's case there would have to be muscles stripped from the lamina on both sides since this involved both sides.

Q. Doctor, let me ask you a question there, by stripping do you mean cutting away?

A. Cutting away from the bone, yes, sir. Then, the intraspinous ligamentum, the ligament flavum, would have to be removed at the fourth and fifth lumbar levels, and probably the opening would then have to be enlarged with a rongeur, that is, a bone cutting instrument, although this is not imperil. Occasionally, just some little removal of a ligament affords enough space to complete your operation. Then, the disc itself is approached, which is usually in front of the nerve root. This is removed, and following this, the space, well, I usually will place an absorbable sponge soaked in a cortisone solution in this space, which lets down on the post-operative adhesions and arthritic changes I feel, and I also take a similar piece and wrap the nerve root with this for the same reason, and then, of course, the muscles are then sewn, the flaccid is sewed and the—

Q. Doctor, let me ask you this, is this piece of absorbent, is it left in the body?

A It's left in yes. It absorbs in about eighteen days.

Q. Doctor, I believe you stated you saw Mr. Davenport the last time on August 12, '66?

A. August 12th, yes, sir.

Q. Has he ever been discharged by you?

A. He has not, no sir.

Q. Doctor, at the time you saw him on August 12th, I believe you stated his condition was unchanged?

A. I did, yes sir.

"The defendant insists that an operation was tendered by them and that the petitioner declined to submit to an operation. On this point, the petitioner insists that the defendant did not tender an operation until he filed his answer in this case.

"On this issue as to the operation, the Court finds the facts support the theory of the petitioner, and the Court is of the opinion that his refusal to submit to the kind of operation recommended by Dr. McClure and described by Dr. McClure in his deposition as a serious operation and as a 'major surgery,' is not sufficient to defeat his claim for compensation in this case. The authority in support of this conclusion is the decision of our Supreme Court in the case of *Edwards v. Travelers Insurance Company,* 202 Tenn., page 364 [304 S.W.2d 489] decided in 1957 in construing T.C.A. 50-1004 held as follows:

'The statute providing that if any injured employee refuses to comply with reasonable requests for examinations and to accept special medical or specialized medical services his right to compensation shall be suspended while he continues in his refusal, does not require a workman to submit to laminectomy for ruptured intervertebral disc to avoid suspension of payments.'

"The Court finds that the petitioner Vallie W. Davenport, previous to the accidental injury of January 13,

1966 had sustained two (2) accidental injuries one on August 2, 1955 and another on February 19, 1962, both while in the employ of O. K. Trucking Company of Cincinnati, Ohio, in which he was awarded 25% and 10% permanent partial disability ratings, respectively and paid accordingly, as shown on pages three and four of this memorandum.

"The Court further finds that on January 13, 1966, the petitioner, Vallie W. Davenport at Dalton, Georgia, while in the scope of his employment engaged in delivering a casket for the defendant, Bland Casket Company, suffered an accidental injury, and that as a result of said accidental injury, the petitioner, Vallie W. Davenport, is totally and permanently disabled and that he is entitled to recover of the defendant, Bland Casket Company and the Second Injury Fund of the State of Tennessee, total and permanent disability compensation benefits in the maximum amount of Fourteen Thousand ($14,000.00) Dollars. The Court is of the opinion that fifty (50%) percent of the recovery should be paid out of the 'Second Injury Fund' of the State of Tennessee, of which the State Treasurer is the custodian, and that the remaining fifty (50%) percent of the compensation should be paid by the defendant, Bland Casket Company, Inc., and its insurance carrier; that the portion adjudged against the defendant, Bland Casket Company and the insurance carrier should be credited with the amount of temporary total disability payments that have been made by the defendant company, which amounts to One Thousand Nine Hundred Seventy-six ($1,976.00) Dollars.

"In the event there are any unpaid hospital, doctor's and medical bills incurred by the petitioner within one

year after the accidental injury of January 13, 1966, as a result of this injury, IT IS ORDERED that the defendant company pay them.

"IT IS ORDERED that the defendant company pay fifty (50%) percent of the costs of the case and that the 'Second Injury Fund' of the State of Tennessee pay fifty (50%) of the costs of the case.

"If an appeal is desired, IT IS ORDERED that a motion for a new trial be filed within thirty (30) days, or the appeal be perfected within thirty (30) days if no motion for a new trial is filed. This August 8, 1967.

s/ John A. Mitchell

JOHN A. MITCHELL,
JUDGE."

On these facts which we find are the facts of the case, we overrule the contentions of the employer that payments to Davenport should be suspended until he submits to an operation. We also overrule the contention that the disability award should have been on the basis of fifteen percent, as unjustifiably refused, surgery would have reduced the disability to this amount. We hold the trial judge properly applied *Edwards v. Travelers Insurance Co.*, 202 Tenn. 364, 304 S.W.2d 489 to the facts.

On the statement of facts in the memorandum, and on the facts in the record, we sustain the State Treasurer's assignment of error, that there is no evidence in the record on which to hold the Second Injury Fund liable for more than thirty-five percent of the award.

While Davenport, and his wife, spoke of some minor pains and discomfort he had suffered following the injuries for which the awards totalling thirty-five percent were made, under the record and the Second Injury Fund Statute, these must be related to the thirty-five percent disability. There is no evidence medical or otherwise to sustain a holding that the thirty-five percent disability, settled by judicial awards, was not thirty-five percent, but fifty percent. On a holding the disability had increased to fifty percent by the time of the second injury.

On the basis of an assignment of error by the State Treasurer, Davenport contends the trial judge should not have credited the $14,000.00 award with the $1,976.00 paid petitioner prior to suit. It is argued this payment was for temporary total disability, and as such is not a credit on a permanent total disability award. *Redmond v. McMinn County,* 209 Tenn. 463, 354 S.W.2d 435, is cited. The Redmond case, which was decided February 8, 1961, stands for this proposition, but it is no longer controlling. By Chapter 362 of the Public Acts of 1963, now codified in T.C.A. sec. 50-1005, (obviously intended to supplant the rule in *Redmond*), it was provided that "The total amount of compensation *payable under this chapter* (Chapter 10, CLAIMS AND PAYMENTS OF COMPENSATION UNDER WORKMEN'S COMPENSATION LAW), shall not exceed fourteen thousand dollars ($14,000.00) in any case, exclusive of medical, hospital, and funeral benefits. (Parentheses and emphasis supplied.) So, it is necessary for us to deny this contention.

It results that all assignments of error are overruled, except that of Charles Worley, Treasurer of the State of Tennessee, which is sustained to the extent indicated;

and the judgment of the lower court is modified accordingly.

BURNETT, CHIEF JUSTICE, and DYER, CHATTIN and CRESON, JUSTICES, concur.