RAMÓN A. RIVERA RIVERA, ETC., recurrente, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, ETC., demandada.

*Número*: O-71-81 *Resuelto*: 18 de octubre de 1973

*E. Delgado Roque* y *J. Márquez Gómez,* abogados del recurrente.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

El obrero Pedro Vidal Nieves sufrió un accidente del trabajo el 17 de junio de 1967 al esforzarse por levantar un carretón lleno de semillas. Tres días después se presentó al Fondo del Seguro del Estado para tratamiento. Exámenes neurológicos condujeron al diagnóstico, mielográficamente comprobado, de la existencia de una hernia discal entre las vértebras L 5 y S 1. Se le dio la correspondiente asistencia médica y tratamiento y se llegó finalmente a la conclusión de que debía someterse a una intervención quirúrgica. El obrero se negó a consentir. En vista de ello se determinó una incapacidad parcial permanente de un 25% de las funciones fisiológicas generales y se le dio de alta con derecho a recibir la correspondiente compensación. Esto ocurrió el 14 de octubre de 1968.

No conforme, Vidal Nieves apeló para ante la Comisión Industrial dando la siguiente razón: "Porque la incapacidad que se me fijó es poca, por lo que solicito mayor incapacidad." La Comisión refirió al obrero en consulta al neurocirujano Dr. Max Ramírez de Arellano y dispuso la celebración de una vista médica. Tanto el Dr. Ramírez de Arellano como el Dr. A. Rodríguez Rosario, Asesor Médico de la Comisión, convinieron en que fue correcto el dictamen médico del Fondo y recomendaron la operación. Vidal Nieves se negó y en vista

de ello se determinó que debía confirmarse el dictamen del Fondo del Seguro del Estado. Vidal Nieves solicitó entonces la celebración de una vista pública. Celebrada ésta, y luego de que los médicos de la Comisión Industrial y del Fondo del Seguro del Estado explicaron sobre el diagnóstico de hernia discal, sobre el rechazo por el obrero del tratamiento recomendado, es decir, la operación, y que el caso había sido cerrado "con una incapacidad de un 25% de pérdida de las funciones fisiológicas generales", Vidal Nieves cambió de parecer y expresó estar dispuesto a someterse a la intervención quirúrgica. En vista de ello la Comisión devolvió el caso al Fondo del Seguro del Estado "para que se proceda con la operación recomendada." Dispuso que una vez hecha la operación debía dictarse la correspondiente decisión final por el Fondo, advirtiendo al obrero de su derecho a apelar nuevamente ante la Comisión Industrial de no estar conforme con el dictamen que se hiciera.

No obstante su expresada conformidad con la operación, el obrero volvió a rechazarla cuando se intentó practicarla. El Fondo confirmó el alta dada anteriormente y el obrero apeló nuevamente para ante la Comisión. Ocurrió exactamente igual que en la ocasión anterior. En vista médica, luego de los correspondientes exámenes, y comoquiera que Vidal Nieves insistiera en su negativa a operarse "si no se le aseguraba que la incapacidad se le va a aumentar", se reconfirmó como "justa y razonable" la incapacidad reconocídale por el Fondo. El obrero volvió a solicitar vista pública ante la Comisión, esta se celebró, en ella volvió a cambiar de parecer accediendo a la operación, y fue el caso devuelto al Fondo con idénticas órdenes a las de la vista anterior. Ante el Fondo regresó Vidal Nieves a su posición de rechazo de la operación.

Transcurrieron cerca de dos años en este ir y venir del Fondo a la Comisión y de la Comisión al Fondo, unas veces aceptando operarse y las más de las veces negándose. El obrero nunca dio una razón satisfactoria para su negativa. Al

principio dijo que tenía que cuidar de su esposa, quien a su vez convalecía de una cirugía discal. Otras veces dijo que no se operaba por "razones personales", que no explicó. Una tercera razón fue que no se le aseguraba que se le *aumentaría* el por ciento de incapacidad. Diferentes facultativos y neurocirujanos que examinaron al obrero coincidieron en que la operación debía hacerse, aunque nada hay en los autos demostrativo de una razonable seguridad de que la operación habría de mejorar la condición del paciente de manera sustancial, o de que se reduciría la incapacidad, que era lo deseable, aunque no lo pensara así el obrero Vidal Nieves. Como hemos visto, él deseaba que se le aumentara el por ciento de incapacidad.

La última resolución de la Comisión Industrial, luego de que Vidal Nieves manifestó estar dispuesto a operarse, tiene fecha de 29 de junio de 1970. Esta vez, devuelto el caso al Fondo del Seguro del Estado, Vidal Nieves dejó a un lado el empeño de obtener mayor compensación vía un aumento en su incapacidad, y reclamó que se le pagasen "dietas" desde el 14 de octubre de 1968, fecha del alta original, hasta el 29 de junio de 1970, fecha de la última resolución de la Comisión Industrial. Es decir, Vidal Nieves reclamó el pago de dietas por todo el tiempo desde que apeló inicialmente a la Comisión Industrial, se celebraron vistas médica y pública, se devolvió el caso al Fondo y volvió a apelar, se celebraron nuevamente vistas médica y pública, hasta que volvió el caso al Fondo al acceder por segunda vez a operarse para nuevamente negarse. Computada conforme a las disposiciones legales aplicables la compensación por "dietas" por dicho período debía ascender a $1,855.65. El Administrador del Fondo denegó su reclamación y contra ello el obrero apeló para ante la Comisión Industrial. Por resolución de 27 de enero de 1971 la Comisión Industrial revocó la decisión del Administrador y dictaminó que debían pagarse al obrero las dietas reclamadas. A petición del Administrador decidimos revisar.

La resolución de la Comisión Industrial descansa en la recomendación de su Asesor Médico en el sentido de que si el obrero no pudo trabajar mientras estuvo pendiente de si se operaba o no, deben pagársele las dietas. Dice la parte dispositiva de la resolución, luego de citar el testimonio del médico:

"En este caso se RESUELVE que al obrero se le deben pagar las dietas por el período que reclama. No creemos que el negarse a operarse sea un impedimento para el pago de sus dietas que son efectivas luego de comprobarse por el Administrador del Fondo del Seguro del Estado, mediante el examen de nóminas, que el obrero no trabajó. En estos casos, independientemente de la recomendación que pudiera hacer el neurocirujano, tal vez sería conveniente que mediante la División Médico-Social del Fondo del Seguro del Estado se orientara al obrero en una forma efectiva, con asesores médicos, de la conveniencia de una intervención quirúrgica."

■ La Ley de Compensaciones por Accidentes del Trabajo, codificada en el título 11 de *Leyes de Puerto Rico Anotadas* (L.P.R.A.), establece distintamente tres tipos de beneficios a que tiene derecho todo obrero o empleado que sufra lesiones o enfermedades ocupacionales dentro de las condiciones de dicha ley, a saber: (1) asistencia médica y medicinas que le sean prescritas, incluyendo servicios de hospital cuando fuere necesario; (2) compensación durante el período de recuperación, mientras el obrero esté incapacitado para trabajar, que es lo que se ha dado en llamar "dietas"; y (3) compensación "adicional" por cualquier incapacidad permanente resultante, fuere de naturaleza parcial o total. ([1])

El pago de dietas, es decir, la compensación que la citada ley concede al obrero durante el período de su recuperación, ([2])

---

([1]) 11 L.P.R.A. sec. 3. Por lo excesivamente extensa que es dicha sección (Art. 3 de la Ley), omitimos su reproducción aquí.

([2]) La tendencia moderna es abandonar la terminología clásica de "incapacidad temporera" o "transitoria" y llamarlo el "período de recuperación" (*healing period*). 2 Larson, *Workmen's Compensation Law*, sec. 57:10; *Guzmán* v. *Phoenix Ins. Co.*, 411 S.W.2d 642 (Texas Civ. App. 1967); *Cummings* v. *United Motor Exch., Inc.*, 236 Ark. 735, 368 S.W.2d

se inicia el cuarto día siguiente a la fecha en que el obrero se presenta al médico para recibir tratamiento, si la incapacidad para el trabajo durase menos de diez días; o se inicia desde el primer día en que se presenta para tratamiento médico si la incapacidad se prolongase por diez días o más. A tales efectos, dispone el Art. 3 de la Ley de Compensaciones por Accidentes del Trabajo:

". . . No se concederá compensación alguna por los primeros tres (3) días subsiguientes a la fecha en que el obrero o empleado se presente al médico para recibir tratamiento, a menos que el período de incapacidad para el trabajo como resultado de la lesión se prolongue por diez (10) días o más, en cuyo caso se pagará al obrero o empleado lesionado el importe de los referidos tres (3) días. . . ." (11 L.P.R.A. sec. 3, inciso 2, pág. 14 del suplemento acumulativo para 1972–73.)

■ Dicha compensación deberá pagarse por todo el período, sin exceder el máximo de 312 semanas que señala la propia ley en su citado Art. 3, hasta la fecha en que el paciente es dado de alta. El alta puede deberse a que el paciente ya está sanado y puede volver a trabajar, o a que ha resultado con una incapacidad permanente y se determina que su condición no ha de cambiar mediante tratamiento médico o quirúrgico adicional. En este último caso, y desde que se le da de alta, el obrero es acreedor a "compensación adicional", computada en base al grado de incapacidad permanente y conforme a los tipos que la ley establece. Así se desprende del citado Art. 3, 11 L.P.R.A. sec. 3. De igual manera se ha resuelto en otras jurisdicciones de sistemas similares al nuestro. *Kirkland* v. *Benedict & Jordan*, 120 So.2d 169 (Fla. 1960); *McKenzie* v. *Campbell & Dann Mfg. Co.*, 209 Tenn. 475, 354 S.W.2d 440 (1962). Véanse Blair, *Reference Guide to Workmen's Compensation Law* (1972),

82 (1963); *McKenzie* v. *Campbell & Dann Mfg. Co.*, 209 Tenn. 475, 354 S.W.2d 440 (1962); *Kirkland* v. *Benedict & Jordan*, 120 So.2d 169 (Fla. 1960).

sec. 11:02; 58 Am. Jur. *Workmen's Compensation*, sec. 283; Aida S. Bitbol, *Accidentes de Trabajo y Enfermedades Reparables*, ed. Bibliografía Omeba, Buenos Aires, 1964. *Cf. Atiles, Admor.* v. *Comisión Industrial*, 63 D.P.R. 664 (1944).

■ Al obrero Pedro Vidal Nieves se le pagaron dietas desde que se presentó al Fondo del Seguro del Estado para recibir tratamiento, hasta el 14 de octubre de 1968, fecha en que se le reconoció una incapacidad permanente equivalente a la pérdida de un 25% de sus funciones fisiológicas generales, y se le dio de alta. Para esta fecha se le había dado todo el tratamiento que su condición requería, excepto operarlo, que, aunque recomendado por los médicos, no fue aceptado por él. De haberse sometido a la operación, el Fondo del Seguro del Estado hubiese tenido que pagarle dietas durante los períodos pre y post operatorios y hasta que finalizara el período de recuperación y se le diera de alta. Rechazada la operación y no habiendo otro tratamiento que dar al obrero para mejorar su condición, actuó correctamente el Fondo del Seguro del Estado al hacer la determinación del por ciento de incapacidad resultante y darle de alta.

Veamos ahora la importancia de la negativa de Vidal Nieves a someterse a la operación. Valga decir, que en este caso la negativa no puede calificarse de irrazonable. Aunque hay un contrasentido en la razón dada por él al efecto de que no se operaba si no se le aumentaba la incapacidad, no podemos sustraernos de que los seres humanos sienten un temor natural por las intervenciones quirúrgicas, sobre todo si su resultado es incierto. Esto es particularmente así cuando se trata de una operación vertebral. Es abundante la jurisprudencia que en casos similares sostiene que no es irrazonable la negativa del paciente. Véanse: *Beth-Elkhorn Corp.* v. *Epling*, 450 S.W.2d 814 (Ky. App. 1970); *Bland Casket Co.* v. *Davenport*, 427 S.W.2d 839 (Tenn. 1968); *American Tobacco Co.* v. *Sallee*, 419 S.W.2d 160 (Ky. App. 1967); *Maldonado* v. *Keller Metal Prod.*, 203 So.2d 158 (Fla. 1967);

*Morgan* v. *Sholom Drilling Co.*, 427 P.2d 448 (Kan. 1967);
*Bethlehem Mines Corp.* v. *Hall*, 379 S.W.2d 58 (Ky. App.
1964); *Ream* v. *Saxman Coal & Coke Co.*, 191 Pa. Super. 408,
156 A.2d 365 (1959); *Walker* v. *International Paper Co.*,
230 Miss. 95, 92 So.2d 445 (1957); *Hamlin* v. *Industrial
Commission*, 77 Ariz. 100, 267 P.2d 736 (1954); *Borucki* v.
*Eagle Pencil Co.*, 281 App. Div. 718, 117 N.Y.S.2d 765
(1952). Además, independientemente de la cuestión de razo-
nabilidad, un obrero no puede ser operado sin su consenti-
miento. *Cf. Montes* v. *Fondo del Seguro del Estado*, 87 D.P.R.
199 (1963).

Empero, la razonabilidad o irrazonabilidad de la negativa
de Vidal Nieves a operarse no juega papel alguno en la solu-
ción de este caso. Terminado el tratamiento, determinada la
incapacidad permanente, y dado de alta el obrero, terminó ahí
mismo su período de recuperación y con ello su derecho al
pago de dietas. Surgió desde ese momento la obligación del
Fondo del Seguro del Estado de compensarle por su incapaci-
dad permanente de acuerdo a lo dispuesto en la ley.

 Esto no quiere decir que cese la obligación de pagar
dietas al obrero tan pronto éste se niegue a operarse. Consi-
deraciones subjetivas pueden influir para que el obrero en
determinados casos y de buena fe niegue su consentimiento a
una intervención quirúrgica y prorrogue con ello el período
de recuperación. En tales casos podría justificarse el pago de
dietas durante un período razonable en que se mantenga la
incertidumbre del obrero. La razonabilidad de la extensión
de ese período habrá de depender de las circunstancias parti-
culares de cada caso. El de autos ciertamente no amerita en
sus hechos tal consideración.

No podemos pasar por alto que la concesión del derecho a
dietas bajo circunstancias factuales como las de este caso
podría tener el efecto de alentar una práctica funesta para
la economía del Fondo del Seguro del Estado. Las indecisiones
del obrero Vidal Nieves obligaron a la repetición de exámenes

y evaluaciones médicas, la dedicación de valioso tiempo por parte de numerosos facultativos y del personal administrativo del Fondo del Seguro del Estado y de la Comisión Industrial, vistas médicas y vistas públicas que resultaron académicas ante los cambios de parecer del obrero, significando todo ello pérdidas de tiempo y gastos extraordinarios. El Fondo del Seguro del Estado atiende decenas de miles de casos anualmente. Fácil es imaginar el impacto desastroso que podría tener si hubiera que pagar dietas a los obreros lesionados mientras detienen el tratamiento que sus casos respectivos ameritan en lo que deciden si lo aceptan o no.

Dijimos en *Cordero, Admor.* v. *Comisión Industrial*, 62 D.P.R. 143, 147 (1943): "El deber primordial del Administrador del Fondo del Seguro del Estado es velar por la solvencia del fondo, defendiéndolo contra toda reclamación que no se ajuste a la ley o que se base en hechos falsos." Por liberales que queramos ser, no podemos concederle a determinado obrero lesionado, en premio a su capricho, lo que podría resultar en privación de beneficios indispensables para otros. "Así, en nombre de la liberalidad se socavaría la solidez financiera del Fondo en perjuicio de los trabajadores y patronos." *Admor. Int.* v. *Comisión Industrial*, 98 D.P.R. 40 (Torres Rigual) a la pág. 44 (1969).

*Se revocará la resolución de la Comisión Industrial de 27 de enero de 1971.*