Thelma M. MINTON, Plaintiff–Appellee,

v.

STATE INDUSTRIES, INC. and Liberty
Mutual Insurance Company,
Defendants–Appellees,

and

Sue Ann Head, Director of the Division of
Workers' Compensation, Tennessee De-
partment of Labor, Second Injury
Fund, Defendant–Appellant.

Supreme Court of Tennessee,
at Nashville.

Feb. 10, 1992.

Charles W. Burson, Atty. Gen. & Report-
er, Dianne Stamey Dycus, Asst. Atty. Gen.,
Nashville, for defendant-appellant Second
Injury Fund.

Julia F. Smith, Thomas E. Stamper,
Clarksville, for plaintiff-appellee.

David J. Pflaum, Watkins, McGugin,
McNeilly & Rowan, Nashville, for defen-
dants-appellees State Industries, Inc., and
Liberty Mut.

OPINION

DROWOTA, Justice.

This is an appeal by the Tennessee De-
partment of Labor, Second Injury Fund
(the Fund), Defendant–Appellant, from a
judgment of the Circuit Court of Montgom-
ery County ordering the Fund to pay 50
percent of the benefits due to the employ-
ee, Thelma M. Minton, Plaintiff–Appellee,
who was determined to be totally and per-
manently disabled. The trial court found
that subsection (a) of T.C.A. § 50–6–208
applied and that the employer, State Indus-

tries, Inc., and its insurer, Liberty Mutual Insurance Company were liable for 200 weeks of benefits (the maximum for an injury to the right leg). The employer and its carrier have not appealed and do not question the trial court's apportionment of the 50 percent award as to them.

## ISSUES

Several factual and legal issues must be resolved in this appeal. The Second Injury Fund contends that Plaintiff is not "permanently and totally disabled through a subsequent injury" and therefore the Fund is not liable under subsection (a). The Fund also avers that subsection (a) does not apply because the injury in this case was to a "scheduled member," Plaintiff's right lower extremity, which the Fund asserts is not covered under subsection (a). This is an issue of first impression under the 1985 amendments to T.C.A. § 50–6–208. The Fund also avers that subsection (b) does not apply because this is not a "body as a whole" case. The Fund's final contention is that if it is liable, its liability should not exceed 10 percent, the amount judicially decreed in Plaintiff's prior workers' compensation settlement. State Industries counters that its liability must be limited to 200 weeks because Plaintiff's injury was confined to her right lower extremity, which is a scheduled member under the Tennessee Workers' Compensation Act.

For the reasons hereinafter stated, we find that State Industries' liability is limited to 200 weeks because Plaintiff's injury was in fact confined to her right lower extremity, a scheduled member. We find that subsection (b) does not apply because the injury is not to the body as a whole. We also find that subsection (a) can apply to scheduled members, contrary to the Fund's contention. However, in this case we find subsection (a) inapplicable because we do not find Plaintiff "permanently and totally disabled."

## THE FACTS

Plaintiff, Thelma Minton, was 58 years old at the time of trial. Ms. Minton has an 11th grade education, is single with no dependents, and owes no mortgage debt on her home. Plaintiff was employed by a shoe manufacturing company for two years prior to going to work for State Industries, a manufacturer of water heaters, on July 7, 1972.

On September 15, 1980, Plaintiff injured her back while in the course and scope of her employment. She was treated by Dr. John McInnis who gave her a 10 percent impairment rating to the body as a whole. Dr. McInnis diagnosed Plaintiff's injury as a possible ruptured disk and Plaintiff received a court-approved workers' compensation award from State Industries of 10 percent permanent disability to the body as a whole. Following her injury, Plaintiff returned to work with State Industries, which had full knowledge of her disability.

On October 11, 1989, while acting within the course and scope of her employment, Plaintiff stepped in a hole in the concrete floor at work and fell, injuring her right knee. On October 24, 1989, Plaintiff initially saw Dr. Thomas Tompkins, an orthopedic surgeon. His diagnosis was "traumatic chondromalacia of the patella." He initially put her on some exercises for her knee. He later gave her a cortisone shot to try to reduce the inflammation and prescribed some physical therapy. On December 13, 1989, Dr. Tompkins performed arthroscopic surgery which was done both for diagnosis and treatment of the knee. At the time of surgery she was found to have severe chondromalacia of the patella and of the medial femoral and tibial condyles. There was no cartilage tear. He smoothed the chondromalacia, which is a roughening or irregularity of a cartilage. Dr. Tompkins testified that the surgery did not seem to relieve the pain in her knee and that neither the therapy, medications, or cortisone shot seemed to help her very much. He did not anticipate the need for further surgery. Dr. Tompkins gave Plaintiff a 30 percent impairment of the right lower extremity or 12 percent of the whole person. He testified that "her permanent restrictions would be that she would be unable to do a job that required prolonged standing, walking, squatting down, or repeated bend-

ing of her knee." Dr. Tompkins made no statement regarding Plaintiff's prior injury in his deposition.

The Plaintiff testified at trial that she is now unable to stand on the leg all day, cannot stoop, cannot bend, cannot squat, and cannot climb. She can no longer mow her yard, vacuum, or generally clean her house. Plaintiff testified that at times pain goes through her leg and up into her back. After the surgery, Plaintiff attempted to return to work at State Industries, however, State Industries would not allow it due to her physical restrictions. Ms. Minton has not sought other employment. Ms. Minton testified that she needed a lump sum workers' compensation award in order to pay her bills, repay loans, and make necessary home repairs.

## FINDINGS OF THE TRIAL COURT

In his initial memorandum opinion, the trial judge found that: "subsection (b) applies because there had been a prior workers' compensation award of 10 percent permanent disability to the body as a whole and the combination of the awards (10 percent and 100 percent) are in 'excess' of 100 percent. The employer is thus liable for 90 percent of the award and the Second Injury Fund is liable for 10 percent of the award." The employer filed a motion to reconsider asserting that its liability should be limited to 200 weeks, or 50 percent, based on the injury to a "scheduled member." In his subsequent amended memorandum opinion the trial court found "that the Plaintiff is permanently and totally disabled as a result of the subject work-related injury and a prior back injury which the Plaintiff sustained in 1980, with the employer liable for 200 weeks of benefits and the Second Injury Fund liable for 200 weeks of benefits. The award shall be commuted to a lump sum." The Court found that the second injury resulted in a 100 percent permanent disability to the right leg, 200 weeks. The Court found "there is no medical evidence that the injury to the Plaintiff's right leg

extended beyond that scheduled member." The Court found that "the second injury, coupled with the prior [1980] injury to the body as a whole sustained by the Plaintiff, renders the Plaintiff permanently and totally disabled." The Court found that subsection (a) applied.

## OUR REVIEW

Our review is *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the findings below, unless the preponderance of the evidence is otherwise. T.C.A. § 50-6-225(e)(2) (1991). This standard of review requires this Court to weigh in depth the factual findings and conclusions of the trial court. *Humphrey v. David Witherspoon, Inc.,* 734 S.W.2d 315 (Tenn.1987).

In *Lock v. Nat. Union Fire Ins. Co.,* 809 S.W.2d 483, 488 (Tenn.1991), we held:

> The Second Injury Fund statute, T.C.A. § 50-6-208, provides that an injured employee may be eligible for benefits in one of two ways. First, if an injured employee has previously sustained a permanent physical disability from any cause or origin and becomes permanently and totally disabled through a subsequent injury, the Second Injury Fund will pay the difference in the amount received by the injured employee for the second injury and the amount to which he would be entitled in order to be compensated for his total disability. T.C.A. § 50-6-208(a). Second, if an injured employee has received a prior workers' compensation award or awards for permanent disability to the body as a whole and the combination of such awards equals or exceeds 100 percent permanent disability to the body as a whole, then the Second Injury Fund will pay benefits due to the injured employee in excess of 100 percent. T.C.A. § 50-6-208(b).[1]

In the case at bar, there is no finding that Plaintiff received awards equal to or exceeding a 100 percent permanent disabili-

---

**1.** *See Burris v. Cross Mountain Coal Co.,* 798 S.W.2d 746 (Tenn.1990); *Sims v. Bituminous*

*Cas. Corp.,* 798 S.W.2d 751 (Tenn.1990).

ty *to the body as a whole* and the trial court was thus correct in finding this was not a subsection 208(b) case. We must thus consider whether this is a subsection 208(a) case and, if so, how the award should be apportioned between the employer and the Fund. As stated earlier, the Fund contends that subsection (a) does not apply to "scheduled members." The Fund also contends that subsection (a) is not applicable here because Plaintiff is not "totally and permanently disabled." However, the Fund avers that if Plaintiff is, in fact, totally and permanently disabled, the Fund's liability is limited to 10 percent, the amount previously Court-approved.

## THE PARTIES' LIABILITY UNDER THE SECOND INJURY FUND STATUTE

### THE EMPLOYER'S LIABILITY

■ The purpose of the Second Injury Fund is to encourage employers to hire handicapped workers by limiting the liability of the employer. To this end, in cases where an employee is "permanently and totally disabled" through a subsequent injury, subsection (a) limits the employer's liability to the amount due because of that subsequent injury.

In *E.I. duPont de Nemours & Co. v. Friar*, 218 Tenn. 554, 560, 404 S.W.2d 518, 521 (Tenn.1966), Chief Justice Burnett, in discussing the history and purpose of the Second Injury Fund legislation stated:

> In the development of the law of Workmen's Compensation the rule has come to be that an employer takes an employee the way he finds him and is liable for the disability resulting from an accident which aggravates a pre-existing physical impairment. This rule, of course, meant that employers were assuming additional liability when a person was hired who had a physical impairment, and naturally resistance to employment of such persons became evident in hiring policies.

> The Legislature, recognizing that employment of handicapped persons is in the interest of society, enacted the Second Injury Fund law to overcome some of the resistance to employment of disabled persons. The clear purpose of this legislation is to encourage employers to hire workers with an existing handicap which would impair their competitive position as a job seeker.

Justice Creson in *Hedges Mfg. Co. v. Worley*, 223 Tenn. 102, 442 S.W.2d 624 (Tenn.1969), stated: "In effect, T.C.A. § 50–1027 [now § 50–6–208] renders the employer of a partially disabled employee liable only for that additional disability resulting from an accident during such employment. The employer is thus liable only for that disability which his employment of a disabled person may occasion. The Second Injury Fund must bear the remaining liability resulting from con[c]atenation of two separate injuries which produce total permanent disability." 223 Tenn. at 112, 442 S.W.2d at 628. In *Hedges*, Curtis Davis, the employee, sustained a 70 percent permanent partial disability as a result of a gunshot wound in his spine and left hip in 1938. In 1956, despite his disability, he went back to work. He was injured in August, 1967; the trial court found that this injury left Davis 30 percent permanently and partially disabled, and that as a result of both the 1938 and 1967 injuries, Davis was 100 percent permanently and totally disabled. The trial court found the employer liable for 30 percent of the total award and the Second Injury Fund liable for 70 percent. The Court in *Hedges* quoted language from T.C.A. § 50–1027, now T.C.A. § 50–6–208(a):

> such earlier injury shall not be considered in estimating the compensation to which the employee may be entitled under this law from the employer or the employer's insurance carrier; provided, however, that in addition to such compensation for a subsequent injury, and after completion of the payments thereof, then such employee shall be paid the remainder of the compensation that would be due for the permanent total disability out of a special fund to be known as the 'Second Injury Fund' herein created.

223 Tenn. at 110, 442 S.W.2d at 627.

Under subsection (a) the employer is liable only for the disability that would have

resulted from the subsequent injury without consideration of the first. The employer's liability under T.C.A. § 50–6–208(a) and § 50–6–207(3)(A)(ii)(*o*) would thus be limited, in this case, to 100 percent of the lower extremity or 200 weeks.

## THE FUND'S LIABILITY

■ The Second Injury Fund avers that, under the 1985 Amendment, subsection (a) does not apply to "scheduled members." Under our prior holdings, the Fund clearly could be liable for scheduled member injuries; the issue is thus whether the 1985 Amendment disallows coverage of scheduled members.

The history of the Second Injury Fund is instructive in considering the Fund's liability. The Legislature created the Fund in 1945, Public Acts of 1945, Chapter 149, recognizing that an employee with a prior permanent disability could become totally and permanently disabled through an industrial accident which did not entirely cause such total disability. In such an event, the Second Injury Fund would pay the remainder of the compensation for permanent total disability to the employee after the employer's liability for the subsequent injury has been determined. In 1982, the Special House Study Committee on Workers' Compensation created an Advisory Committee to study Tennessee's workers' compensation law. In 1984, the Committee issued a Report that formed the basis for a proposed revision of the workers' compensation laws. Although this proposal passed the General Assembly in 1984 as House Bill 2146, the Governor vetoed it on June 4, 1984. 1984 House Journal at 3535–36. The veto was not overridden, the General Assembly having adjourned *sine die* on May 24, 1984. Senate Joint Resolution No. 220, Public Acts of 1984.

The following year, a nearly identical bill was introduced as House Bill No. 411 (Senate Bill 832). Amendments were proposed by the Administration and other interested groups such as manufacturers, the insurance industry, and labor. A compromise bill was passed by the General Assembly and signed by the Governor as Chapter 393, Acts of 1985.

The 1984 Advisory Committee Report noted that the then current law severely restricted the availability of the Second Injury Fund to employers. Prior to 1985, the statute required that in order to be compensable under the Second Injury Fund, the subsequent injury must have resulted in 100 percent permanent disability as a result of "the loss, or loss of use of *another* member." T.C.A. § 50–6–208(a) (1983) (emphasis added). Where the subsequent injury was to the same part of the anatomy as the prior injury, there could be no recovery from the Second Injury Fund. *Brown v. John Martin Const. Co.*, 642 S.W.2d 145, 147 (Tenn.1982) (citing *Campbell v. Travelers Ins. Co.*, 482 S.W.2d 779, 781 (Tenn. 1972)). The constraints this requirement placed on the availability of the Fund are obvious. Employers hiring previously disabled persons would be greatly, if not primarily, concerned about reinjury or aggravation of the prior injury, yet under old law, the Second Injury Fund was not available under such circumstances. The 1985 Amendments deleted the "another" member requirement. This deletion did not, however, affect the applicability of subsection (a) to "scheduled members." We hold that scheduled members are covered under subsection (a), and reject the Fund's argument that the Legislature, by use of the words "totally disabled," intended to exclude scheduled members, even if incapacitated, from this subsection.

■ We now address the issue of whether Plaintiff was totally and permanently disabled through a subsequent injury, and if so, whether the court's apportionment of 50 percent to the employee and to the Fund was correct. The trial court found subsection (a) applicable, reasoning that a combination of the two injuries (the prior injury to the back and the present injury to the knee) rendered Plaintiff totally and permanently disabled (400 weeks under the Act). The trial court found the employer liable "only for the disability that would have resulted from the subsequent injury." In this case the trial court found the employer

liable for 100 percent of the scheduled member, the right lower extremity, for a total of 200 weeks. Having found Plaintiff permanently and totally disabled, he then found the Fund liable for the remaining 200 weeks under subsection (a).

Plaintiff relies on *Dailey v. Southern Heel Co.*, 785 S.W.2d 344 (Tenn.1990), for the proposition that the combination of a second injury to a scheduled member combined with a prior injury to the body as a whole may result in a finding of total disability and an apportionment of the maximum 400 weeks between the employer and the Fund. In *Dailey*, as here, the Second Injury Fund insisted that Plaintiff was not totally and permanently disabled. Our review in *Dailey* was limited by the material evidence rule and, finding some evidence of total disability, we affirmed the Chancellor's finding.

In *Dailey* the employee had prior work-related injuries that resulted in permanent disabilities. In the 1960's he had back surgery, and in 1970 his right kneecap was removed, for which he received an award of permanent disability. In 1971 the little finger on his right hand was amputated resulting in further permanent disability. Dailey injured his left knee on March 3, 1983, and his surgeon gave him a 20 percent permanent partial disability rating to the left lower extremity, or eight percent permanent partial disability to the body as a whole. Plaintiff's doctor, Dr. Young, also noted a 32 percent disability to the right lower extremity. Dr. Young testified that the combination of all of Plaintiff's injuries resulted in a 35 percent permanent partial disability to the body as a whole. Based upon this, the trial court awarded plaintiff 60 percent permanent partial disability to the left leg and found that Plaintiff was totally and permanently disabled. Because *Dailey* was a subsection (a) case, the employer's liability was limited to 60 percent permanent partial impairment to the employee's left leg (120 weeks) and the Fund was liable for the remaining 280 weeks. It is unclear whether the prior injuries totaled 280 weeks, but we assume they did. What is clear is that subsection (a) applied to a scheduled member—Dailey's left leg.

The apportionment in *Bland Casket Co. v. Davenport,* 221 Tenn. 492, 427 S.W.2d 839 (Tenn.1968), is somewhat clearer. Davenport injured his low back and right shoulder on August 2, 1955, and was awarded 25 percent permanent partial disability. On February 19, 1962, Davenport fractured his left foot and was awarded 10 percent permanent partial disability. On January 13, 1966, Davenport injured his back. Dr. McClure diagnosed Davenport's condition as two ruptured disks in the low back and testified that Davenport was permanently and totally disabled. The trial court found Davenport totally and permanently disabled and assessed 50 percent of the recovery against the Second Injury Fund and 50 percent against Bland Casket Company. The Second Injury Fund appealed and alleged that there was no evidence in the record on which to hold the Fund liable for more than 35 percent of the award. This Court held that "there is no evidence medical or otherwise to sustain a holding that the 35 percent disability, settled by judicial awards, was not 35 percent, but 50 percent . . . [o]r . . . had increased to 50 percent by the time of the second injury." 221 Tenn. at 506, 427 S.W.2d at 845. This Court modified the award, holding the Fund liable only for 35 percent, the amount of the prior court approved awards, and the employer liable for 65 percent.

In the case at bar, Plaintiff argues that, with reference to her prior 1980 back injury, Dr. McInnis determined that she had sustained a permanent impairment of 10 percent to the body as a whole and that her court approved 10 percent, 40 weeks, permanent partial disability to the body as a whole did not encompass a vocational rating. It may well be that the 10 percent settlement was low. However, we have previously held that a court approved settlement cannot be retried. In *Hale v. CNA Ins. Companies,* 799 S.W.2d 659 (Tenn. 1990), we held that "[c]oncerns for judicial economy and finality of settlements in the context of workers' compensation litigation, led us to reject the employer's contention that a trial court in a subsequent pro-

ceeding is not bound by a prior judicial determination regarding the extent of disability stemming from a prior injury for purposes of apportionment under subsection (b)." 799 S.W.2d at 661. These same considerations apply to a subsection (a) case.

Nonetheless, there are certain circumstances in which the prior injury can be redefined if it has been aggravated by the subsequent injury. For example, in *Wiseman v. E–Con Mills, Inc.*, 517 S.W.2d 191 (Tenn.1974), Wiseman injured his right ankle on July 16, 1967, and was awarded 30 percent disability to the right lower extremity. Subsequently, on March 5, 1973, he injured his left foot. As a result of the two injuries, the plaintiff was having to place abnormal stress on his right ankle in attempting to walk, and the right extremity was causing him extreme discomfort. The orthopedic specialist who testified in the case stated that the employee was totally and permanently disabled as the result of the *two* injuries. The orthopedic surgeon testified that the Plaintiff would retain 40 to 50 percent permanent partial disability of the left lower extremity as the result of the more recent injury. He said that "the right lower extremity, however, was more disabled than the left because of the severe traumatic arthritis which had developed over the intervening years since the first accident. He said that the combination of the two events rendered the employee totally and permanently disabled." 517 S.W.2d at 192.

The Chancellor found that Wiseman had sustained 45 percent permanent partial disability to the left lower extremity as a result of the second injury. Since the injury was a scheduled injury, the Chancellor followed the schedule contained in T.C.A. § 50–1007(c) and awarded workers' compensation benefits for 90 weeks, this being 45 percent of the 200 weeks maximum allowed for loss of use of a leg. Inasmuch as the medical testimony clearly indicated that the employee had sustained total permanent disability as a result of the two injuries, the Chancellor awarded a recovery against the Second Injury Fund for 310 weeks. This Court stated: "The employer at the time of the second accident was liable only for the disability that would have resulted from the latter injury." 517 S.W.2d at 193. This Court further held that "the employee shall be paid out of the Second Injury Fund for the remainder of the compensation due for total permanent disability." The Court concluded that "[t]he holding of the Chancellor is not only in accord with the only medical proof tendered in the record ... [i]t is also consistent with the policy underlying the Second Injury Fund, of encouraging the employment of handicapped persons by limiting the exposure of the employer to the immediate consequences of the second injury." 517 S.W.2d at 193.

We have consistently held that expert medical testimony is required to establish causation. In *Wiseman* there was such testimony. Here, there is no medical evidence in the record that the present knee injury aggravated the previously injured back. The testimony of Dr. Tompkins reflects that the injury was confined to a scheduled member—her right knee. We have found no medical evidence establishing a permanent disability to Plaintiff's back as a result of the injury to her knee on October 11, 1989.

The trial judge found the combination of the two injuries rendered Plaintiff totally and permanently disabled, and consequently awarded Plaintiff 400 weeks benefits under the Act. We find no medical proof suggesting Plaintiff is 100 percent disabled and thus entitled to 400 weeks. The employer's liability is limited to 200 weeks, 100 percent to the lower extremity. The Fund's liability is limited to 10 percent, unless there is medical proof which would redefine the first injury as found in *Wiseman v. E–Con Mills, Inc., supra*. Such proof is lacking in this case.

We affirm that portion of the trial court's award respecting the employer and its insurance carrier. The trial court held that since the Plaintiff's second injury was to a scheduled member, T.C.A. § 50–6–208(a) is applicable. The trial court found the employer to be liable for 200 weeks or 100 percent disability to Plaintiff's leg pur-

suant to T.C.A. § 50–6–207(3)(A)(ii)(*o*). We reverse that portion of the trial court's finding that the Second Injury Fund is liable for 50 percent or 200 weeks. There is no medical evidence in this record that the knee injury in 1990 aggravated the back injury of 1980. The trial court was therefore in error in finding that a combination of the two injuries rendered the Plaintiff totally and permanently disabled so as to be entitled to benefits from the Second Injury Fund pursuant to T.C.A. § 50–6–208(a). We find Plaintiff's aggregate permanent disability to be 60 percent and thus the Second Injury Fund is not liable. The Second Injury Fund's issue concerning a lump sum award is now moot, and will not be considered by this Court. The judgment of the trial court is accordingly affirmed in part, reversed in part, and remanded. The costs of this cause shall be taxed equally between the parties.

REID, C.J., and O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.