EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Heberto Morales Bengochea | Certiorari |
| | |
| Peticionario | 2008 TSPR 73 |
| vs. | 173 DPR ____ |
| Banco Popular de Puerto Rico | |
| Recurrido | |

Número del Caso: CC-2006-232

Fecha: 7 de mayo de 2008

Tribunal de Apelaciones:

        Región Judicial de San Juan

Juez Ponente:

        Hon. Ivonne Feliciano Acevedo

Abogados de la Parte Peticionaria:

        Lcdo. Charles Zeno Santiago
        Lcdo. Víctor M. Bermúdez Pérez

Abogado de la Parte Recurrida:

        Lcdo. José J. Santiago Meléndez


Materia: Despido Ilegal, Daños y Perjuicios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Heberto Morales Bengochea

     Peticionario

                       CC-2006-232

      v.

Banco Popular de Puerto Rico

     Recurrido

SENTENCIA

San Juan, Puerto Rico, a 7 de mayo de 2008.

Por medio del presente recurso se nos solicita revisar el dictamen del Tribunal de Apelaciones, mediante el cual el referido foro revocó la Sentencia dictada por el Tribunal de Primera Instancia. Mediante dicha sentencia, el foro de instancia declaró ha lugar una acción sobre despido ilegal presentada por el aquí peticionario, señor Heberto Morales Bengoechea, al amparo de la Ley 80 de 30 de mayo de 1976, Ley Núm.44 del 2 de julio de 1985 , el American with Dissabilities Act, 42 U.S.C.A 12101, la Ley Núm. 45 del 18 de abril de 1935 y una acción por daños

y perjuicios al amparo del Artículo 1802 del Código Civil de Puerto Rico.

I

El peticionario, señor Heberto Morales Bengoechea, en adelante señor Morales, laboró como empleado a tiempo indeterminado desde el año 1981 hasta el año 1996, en el área de pagador-receptor en una sucursal del Banco Popular de Puerto Rico, en adelante BPPR, localizada en Barrio Obrero.

El 26 de abril de 1985, el señor Morales, presenció un asalto ocurrido en el área de pagador-receptor a su cargo. A partir de este incidente, comenzó a padecer episodios de asfixia y ansiedad. En un principio atribuyó estos síntomas a alguna condición fisiológica o respiratoria, por lo que buscó atención médica de generalistas.[1] Sin embargo, no se le diagnosticó condición física alguna que causara los síntomas expresados, hasta que finalmente fue referido a un médico siquiatra.

En 1985, fue atendido por el doctor Juan G. Soto Silva, médico siquiatra, quien posteriormente lo refirió al doctor Carlos E. Ifarragueri, en adelante Dr.

---

[1] Surge del expediente que los primeros médicos a los que acudió el señor Morales fueron: el doctor Zayas, médico generalista y el doctor Gary Montalvo, otorrinolaringólogo. Ambos confirmaron que sus síntomas no tenían una procedencia física.

Ifarraguerri, siquiatra, con quien el señor Morales se atendió hasta el año 1994.[2]

En 1986, el señor Morales, dirigió una misiva al BPPR en la que notificó la condición que estaba padeciendo y a su vez, solicitó ser trasladado a otra sucursal por razones de salud. Dicha petición no le fue concedida.

Así las cosas, el señor Morales continuó bajo tratamiento psiquiátrico privado, el cual consistía principalmente en terapias y medicamentos.[3] Tres años después, peticionó nuevamente al BPPR un cambio de posición como pagador-receptor y explicó que, las evaluaciones médicas reflejaron que el manejo de dinero y personal de un modo directo le producía mucha ansiedad.

Constan en el expediente del señor Morales varias certificaciones médicas dirigidas al BPPR y emitidas por su médico de cabecera, el Dr. Ifarraguerri. Entre ellas, una evaluación realizada el 30 de junio de 1994, en la cual el Dr. Ifarraguerri, indicó que éste padecía de una depresión aguda con ansiedad severa y episodios de

---

[2] Transcripción de la prueba, Exhibit 1, folios 29-30. El señor Morales recibió tratamiento de varios especialistas como el doctor Juan Soto Silva, médico siquiatra, el doctor Carlos E. Ifarraguerri, médico siquiatra, la doctora Margarita Tello, médico e inspectora de Medicina Especializada en el FSE, la doctora Natividad Rodríguez, médico siquiatra del FSE, la doctora Vilma Meléndez, médico generalista y coordinador del área de condiciones emocionales del FSE, el doctor Juan A. Lastra Aracil, médico siquiatra del FSE.

[3] El señor Morales tenía que tomar como parte de su tratamiento los psicofármacos siguientes: *Tranxene*, *Prozac* y *Restoril*.

pánico. A su vez, recomendó que se ausentara de su trabajo por diez (10) días.[4] Posteriormente, expidió otro certificado médico en el que indicó que, como consecuencia de su condición, la capacidad del señor Morales para tolerar estrés estaba muy limitada. En esta ocasión, recomendó un descanso por dos (2) semanas y que fuese reasignado a realizar una tarea diferente a las que actualmente desempeñaba como pagador-receptor. Finalmente, el Dr. Ifarraguerri, recomendó que se mantuviera sin trabajar temporeramente hasta el 3 de octubre de 1994. Esta vez, enfatizó que consideraba que no debía desempeñarse en áreas donde el riesgo de asaltos fuese muy alto, y donde la tarea asignada fuera el manejo de dinero en efectivo.[5]

El 16 de agosto de 1994, el señor Morales acudió a la Corporación del Fondo del Seguro del Estado, en adelante FSE, donde alegó que había quedado emocionalmente afectado como consecuencia del asalto ocurrido en la sucursal del BPPR donde trabajaba. Luego de la correspondiente evaluación, el FSE determinó que el record médico del señor Morales demostró una relación causal entre el accidente de trabajo y su condición. De esta manera concedió al señor Morales los beneficios por razón de accidente ocurrido en el empleo y recomendó al

---

[4]  Apéndice del Recurso de Apelación de la parte demandada, Exhibit 5, pág. 324.

[5] Apéndice del Recurso de Apelación, Exhibit Conjunto 14, pág. 294.

señor Morales tratamiento en descanso con su médico privado, el Dr. Ifarraguerri.[6]

Durante este tiempo de descanso concedido por el FSE, el señor Morales envió una comunicación escrita a la señora Janet Ibern, especialista de la División Recursos Humanos del BPPR, en la que solicitó un cambio de tareas como acomodo razonable al amparo de la ley federal

---

[6] Apéndice del recurso de *Certiorari*, Exhibit J, pág. 100. Cabe señalar que el FSE orientó al señor Morales sobre su derecho a acomodo razonable. La carta suscrita por el señor Héctor Rivera Estolaza, Especialista en rehabilitación del FSE, recomendó lo siguiente:

> El Fondo del Seguro del Estado en su compromiso de servicio a patronos y lesionados, respetuosamente somete ante su consideración la recomendación de un **acomodo razonable** para el empleado Heberto Morales Bengoechea […](Énfasis nuestro).
>
> De las **evaluaciones médicas y del análisis ocupacional** se desprende la necesidad de reubicar al empleado a otro escenario que no sea una sucursal, con tareas donde no esté expuesto a posibles asaltos, al manejo de valores en efectivo ni al contacto personal directo con el público. (Énfasis nuestro).
>
> Se recomienda al patrono que evalúe en la Oficina de Recursos Humanos **alternativas ocupacionales** compatibles con las limitaciones emocionales de éste empleado. (Énfasis nuestro).
>
> Le solicitamos que el caso sea evaluado a tono con los procedimientos administrativos del Banco Popular y en armonía con la legislación estatal y federal para las personas con impedimentos que tienen potencial para seguir siendo productivos en el trabajo.

conocida como "American with Disabilities Act", en adelante Ley ADA.[7]

El 1 de noviembre de 1994, el FSE autorizó al señor Morales a trabajar pero sujeto a continuar el tratamiento siquiátrico con su médico de cabecera. Conforme a la decisión del FSE, el señor Morales se presentó a trabajar pero sostuvo que no podía realizar las labores de pagador-receptor. Así las cosas, la señora Chary Piñeiro, oficial de reclutamiento de la División de Recursos Humanos del BPPR, dirigió una carta al Administrador del FSE señalando que no le era posible ofrecer acomodo razonable al señor Morales, ya que no tenían un puesto disponible en ese momento.[8]

El 8 de diciembre de 1994, el señor Héctor Rivera Ostalaza, especialista en rehabilitación del FSE de la región de San Juan, examinó al señor Morales y certificó que su condición emocional le impedía trabajar como pagador-receptor. Asimismo rindió un informe en el cual indicó que el señor Morales, no estaba capacitado para retornar a su trabajo habitual, ya que tenía limitaciones sustanciales y permanentes para realizar las tareas del puesto de pagador-receptor. No obstante, solicitó la reubicación del señor Morales en un área donde no tuviese contacto con dinero y personal directo.[9]

---

[7] 42 U.S.C.A 12101.

[8] Carta dirigida al licenciado Pedro Soto Ríos, administrador del FSE, Región de San Juan. Apéndice del Recurso de *Certiorari*, Exhibit N, pág.104,
[9] *Id*.

A finales del año 1994, el BPPR le requirió al señor Morales que gestionase los beneficios por incapacidad a largo plazo del Seguro Social.[10]  Inconforme con este curso de acción, el señor Morales manifestó al BPPR su desacuerdo y expresó que, no consideraba que su incapacidad requiriera la solicitud de dichos beneficios ya que podía desempeñarse sin problemas en otras áreas de trabajo.  Ante esto, el BPPR le indicó que debía solicitarlos como parte del proceso que estaba llevándose a cabo.[11]

Finalmente, los beneficios por incapacidad del Seguro Social le fueron denegados toda vez que se determinó que a pesar de su condición nerviosa, el señor Morales podía realizar otro tipo de trabajo.[12]

El 12 de junio de 1995, el FSE dio de alta al señor Morales, con un diagnóstico final de incapacidad parcial permanente.[13]

_____

[10] Transcripción escrita de la vista en su fondo, Exhibit 1, pág. 53. Véase además, Apéndice del Recurso de Apelación, Exhibit 1 de la parte demandante, pág. 295.

[11] Surge del expediente que el señor Morales envió una carta dirigida a la señora Tony Carrión, empleada de Connecticut General Insurance Company, mediante la cual le comunicó su incorfomidad en solicitar los beneficios por incapacidad del Seguro Social. Expresamente señaló que únicamente estaba incapacitado para desempeñarse en el BPPR como pagador-receptor, funciones especificadas por las recomendaciones médicas. Apéndice del Recurso de *Certiorari,* pág.166-167.

[12] Apéndice del Recurso de *Certiorari* ante el Tribunal de Apelaciones, págs. 163-170.
[13] Este informe fue preparado por el doctor Juan A. Lastra Aracil. La impresión del diagnóstico fue de <u>Trastorno obsesivo compulsivo con intromisión pobre y rasgos</u>

El señor Morales continuó trabajando con dificultad hasta que el 20 de junio de 1995, tuvo que ser atendido por el doctor Juan G. Soto Silva. Dicho médico certificó que el señor Morales, no estaba capacitado para reintegrarse a trabajar con público y en lugares que revivieran la experiencia del asalto.

A solicitud del BPPR, el doctor Israel Ganapolsky, examinó al señor Morales y confirmó su incapacidad para trabajar en el área de pagador-receptor.[14]   Sin embargo,

---

persecutorios.   Se le diagnosticó un *Global Assesment of Function Scale* (GAF) de 55-60 de incapacidad.   Apéndice del Recurso de *Certiorari*, Exhibit B, pág.154 .

El Dr. Ifarraguerri explicó durante la vista en su fondo que, el GAF esencialmente mide "la operación global de la capacidad para funcionar".   Continuó expresando que para calcularlo se consideran entre otros, aspectos íntimos, relaciones interpersonales y vocacionales.

Asimismo añadió que un GAF de 55-60, constituye una pérdida de capacidad para funcionar bastante significativa lo cual le incapacita para trabajar en las funciones que tenía que desempeñar como pagador-receptor. Sin embargo, ello no implicaba que no pudiese desempeñarse en otro tipo de trabajo. (Transcripción escrita de la vista, pág.55).

[14] El reporte evaluativo del Dr. Israel Ganapolsky, médico siquiatra expresó lo siguiente:

El señor Heberto Morales Bengoechea fue entrevistado y examinado en mi oficina el 21 de julio de 1995 para evaluación referido por su patrono Banco Popular de Puerto Rico para autorización de capacidad residual de trabajo.   De nuestra entrevista surgió la necesidad de una evaluación siquiátrica la cual fue hecha el 30 de julio de 1995 por el Dr. Andrés López Cumpiano, médico siquiatra, el cual rindió un informe adjunto. Tanto el Dr. López Cumpiano como yo estamos de acuerdo que el señor Morales presenta un cuadro de depresión mayor de largo tiempo de evaluación que sin duda, necesita

el señor Morales <u>no fue reubicado y continuó trabajando como pagador-receptor</u>. No obstante, reiteró al BPPR su solicitud de acomodo razonable.

El 21 de junio de 1995, por orden de sus supervisores inmediatos, se le requirió al señor Morales asistir a un adiestramiento de personal dirigido a los empleados de las áreas de pagador-receptor.[15] Surge del testimonio de la señora Carmen Rivera, instructora a cargo del adiestramiento, que al señor Morales se le ordenó marcharse antes de finalizar el mismo. Esta decisión se basó en las constantes interrupciones que alegadamente ocasionó con salidas al baño y comentarios negativos.

Posteriormente, el BPPR le comunicó verbalmente que, debido a que precisaban de más tiempo para el acomodo razonable, le otorgarían una licencia sin sueldo.

Ante este panorama, el señor Morales contrató los servicios del licenciado Víctor M. Bermúdez Pérez, en adelante, licenciado Bermúdez, quien mediante cartas dirigidas al BPPR, solicitó el acomodo razonable para su cliente. En cartas subsiguientes advirtió al BPPR que la negativa injustificada para conceder el acomodo razonable constituía una violación a las leyes laborales locales y federales.

---

<u>tratamiento siquiátrico activo y al presente no está en condiciones de trabajar</u>. (Subrayado nuestro.)

[15] El adiestramiento estaba dirigido específicamente a los cajeros de las sucursales, toda vez que se estaba implementando un nuevo programa de computadoras.

La situación de inestabilidad e incertidumbre respecto a la reubicación del señor Morales a su trabajo produjo que su condición nerviosa se agravara. Como consecuencia, éste fue ingresado desde el 9 de agosto de 1995 hasta el 22 de agosto de 1995 en la institución siquiátrica First Hospital Panamericano.

Una vez dado de alta, el señor Morales acudió al FSE donde le indicaron que el BPPR, a través de la licenciada Emily Arean Díaz, Vicepresidenta Auxiliar de la División de Recursos Humanos, había solicitado ante el FSE la reapertura del caso siquiátrica del señor Morales.

Durante estas fechas, específicamente en octubre de 1995, surgieron tres nuevas plazas en el BPPR, una como chofer y dos como representantes de servicios de telebanco.[16] Sin embargo, el señor Morales no fue considerado para ninguna de ellas[17] y continuó en licencia sin sueldo por aproximadamente seis (6) meses, hasta que finalmente, el 14 de febrero de 1996, fue despedido.[18]

---

[16] Apéndice del recurso de *Certiorari*, págs. 308 y ss.

[17] Esto surge del testimonio de la señora Chary Piñeiro, encargada de reclutamiento de personal, mientras contestaba preguntas relacionadas al procedimiento del BPPR en el manejo de vacantes y la solicitud de acomodo razonable del señor Morales. Transcripción escrita de la vista en su fondo, pág.107-108.

[18] La carta de despido emitida por el BPPR a través de la licenciada Emily Arean, de la División de Recursos Humanos, lee del modo siguiente:

Estimado señor Morales:

El BPPR fundamentó su decisión en que éste nunca se comunicó con el personal del BPPR y adujo que el señor Morales había hecho caso omiso a las cartas cursadas a través de la licenciada Emily Arean.

A pesar de que fue un hecho probado en juicio que, el BPPR fue notificado de que toda comunicación para el señor Morales se viabilizaría por conducto de su representante legal, el BPPR obvió el cauce legal en sus comunicaciones y continúo remitiéndolas al señor Morales y a su esposa. No obstante, durante el período que el señor Morales estuvo suspendido por licencia sin sueldo, el licenciado Bermúdez mantuvo comunicación escrita con el BPPR a los fines de mantener a sus supervisores informados de la condición del señor Morales.[19] Estas cartas dirigidas al BPPR por medio de la representación legal del señor Morales, constan en el expediente del empleado y fueron admitidas en evidencia por las partes.

El 6 de mayo de 1996 el señor Morales, presentó demanda ante el Tribunal de Primera Instancia, contra el BPPR sobre entredicho provisional, preliminar y permanente y daños y perjuicios, amparada en la Ley Núm.

---

Habiendo hecho caso omiso a nuestras cartas anteriores, copia de las cuales fueron enviadas a su esposa y su abogado, licenciado Víctor Bermúdez, le notificamos que se le da de baja como empleado de nuestra institución efectivo el 14 de febrero de 1995.

[19] Surge del expediente que la licenciada Emily Arian dirigió una comunicación a la señora Marta García, esposa del señor Morales, requiriéndole un certificado médico para cubrir el período de la hospitalización del señor Morales.

44 de 2 de julio de 1985,[20] que prohíbe discrimen contra impedidos, la "American with Dissabilities Act",en adelante Ley ADA, *supra* [21]*,* la Ley de Compensaciones por accidentes de trabajo, Ley Núm. 45 de 18 de abril de 1935, según enmendada,[22] , la Ley Núm. 80 de 30 de mayo de 1976,[23] y una acción en daños y perjuicios al amparo del artículo 1802 de nuestro Código Civil.[24]

Alegó, entre otras cosas, que el BPPR se negó a proveerle acomodo razonable a pesar de las solicitudes presentadas y de las recomendaciones de sus facultativos médicos, que se le había negado su derecho a reinstalación conforme a la Ley Núm. 45, *supra* y que había sido objeto de un despido injustificado y discriminatorio.

Luego de varios incidentes procesales, el BPPR presentó ante el Tribunal de Primera Instancia, una moción de sentencia sumaria en la que solicitó la desestimación de las causas de acción incoadas por el señor Morales. En síntesis, alegó que el señor Morales no era una persona con impedimento según lo dispuesto en la Ley Núm. 44, *supra*, y la Ley ADA, *supra.* Adujo, además, que no cumplía con los requisitos del artículo 5(a) de la Ley Num.45, *supra.* El Tribunal de Primera

---

[20] 1 L.P.R.A secs. 501y ss.

[21] 42 U.S.C.A. 12101 y ss.

[22] 11 L.P.R.A. secs. 1 y ss.

[23] 29 L.P.R.A. secs.195 y ss.

[24] 31 L.P.R.A.sec.5141.

Instancia acogió la sentencia sumaria y desestimó la causa de acción del señor Morales.

De esta determinación, el señor Morales acudió ante el Tribunal de Apelaciones mediante recurso de apelación.[25] Dicho foro, revocó la sentencia sumaria dictada por el foro de instancia y ordenó la celebración del juicio correspondiente.

Concluidos los procedimientos pertinentes, el 19 de octubre de 2004, el Tribunal de Primera Instancia concluyó que, el BPPR no tenía justa causa para despedir al señor Morales. En consecuencia, condenó al BPPR a pagar el doble de los salarios dejados de percibir por el señor Morales durante el período de despido ilegal. Además, ordenó el pago de cincuenta mil dólares ($50,000) por concepto de angustias mentales y daños morales.

El 3 de noviembre de 2003, el señor Morales presentó una solicitud de Reconsideración y/o enmienda de Sentencia, mientras que el BPPR presentó una solicitud de "Determinaciones de Hecho y Reconsideración".

El 19 de octubre de 2004, el Tribunal de Primera Instancia, emitió Sentencia enmendada en la que concluyó que el despido del señor Morales fue contrario a las leyes Num. 80, *supra* y Núm. 45, *supra*, y ordenó la reinstalación del señor Morales.

No conforme con dicho dictamen, el BPPR acudió al Tribunal de Apelaciones. En síntesis alegó que, el foro

---

[25] KLAN 199900495.

de primera instancia erró al negarse a formular las "Determinaciones hechos adicionales" y al concluir que, conforme a la Ley Núm.80, *supra*, el despido fue injustificado. Señaló además, que dicho forro erró al determinar que el señor Morales era una persona con impedimentos a tenor con la Ley ADA, *supra*, y que aún en el caso que así fuera, dicho foro incidió al decidir que el BPPR violó su obligación de proveer acomodo razonable.

Por último, BPPR arguyó que tanto el remedio de reinstalación del señor Morales como la concesión de salarios dejados de percibir por éste al momento de su despido, eran improcedentes toda vez que, para esa fecha, el señor Morales se encontraba disfrutando de una licencia sin sueldo y no estaba capacitado para desempeñar las funciones de su posición.

El 21 de septiembre de 2005, el foro intermedio apelativo revocó la decisión del foro primario y desestimó en su totalidad la demanda presentada por el señor Morales en contra del BPPR. Fundamentó su decisión en que la única limitación probada del señor Morales fue la de trabajar en las áreas de manejo de dinero y/o interacción con el público.

Asimismo señaló que, por no ser una persona con impedimentos, no le asiste el derecho a un acomodo razonable, y que aún en el caso de que lo fuera, éste hizo caso omiso a la publicación de edictos sobre posiciones vacantes.

Finalmente, el Tribunal de Apelaciones, concluyó que el BPPR tuvo justa causa para el despido del señor Morales, ya que la prueba presentada demostró <u>insubordinación y abandono de empleo</u> por parte de éste.

Inconforme, el señor Morales presentó oportuna reconsideración, la cual fue declarada no ha lugar. Por tal razón, acude ante nos, mediante recurso de *Certiorari*, alegando la comisión de los errores siguientes:

**Erró el Honorable Tribunal de Apelaciones al haber revocado la sentencia emitida por el Tribunal de Primera Instancia sustituyéndose las determinaciones de hechos que emitiera dicho foro contenidas en la misma que a su vez estaban basadas en determinaciones de credibilidad.**

**Erró el Honorable Tribunal de Apelaciones al haber revocado al Honorable Tribunal de Primera Instancia al haberse sustituido las conclusiones de derecho que fueran ampliamente fundamentadas por el Honorable Tribunal de Primera Instancia en la Sentencia revocada.**

**Incurrió en error el Honorable Tribunal de Apelaciones al haber revocado al Tribunal de Primera Instancia al haber ignorado consideraciones de política pública, así como principios básicos de hermenéutica aplicables a controversias que envuelven la interpretación de estatutos laborales.**

II

Modificamos la sentencia del Tribunal de Apelaciones del modo siguiente: se confirma en cuanto a que <u>no proceden</u> las reclamaciones de autos al amparo de la Ley de Compensaciones por Accidentes de Trabajo, Ley Núm. 45

y la reclamación por violación a legislación especial, y de violación al derecho a la intimidad por el 1802.[26]

En lo que respecta al despido discriminatorio conforme a las leyes Núm. 44, y la Ley ADA, revocamos la determinación del foro intermedio apelativo y confirmamos la decisión del Tribunal de Primera Instancia. De este modo, concedemos los remedios disponibles al amparo de la Ley Núm. 100 de 30 de junio de 1959.[27] Esto es, el doble de los salarios dejados de percibir, aumentos y beneficios marginales, luego de deducir cualquier suma

---

[26] Al confirmar esta parte de la sentencia emitida por el Tribunal de Apelaciones estamos revocando los remedios concedidos por el Tribunal de Primera Instancia al amparo de éstas disposiciones. Estos fueron los siguientes:

a) En lo que respecta a la Ley de Compensaciones por Accidentes de Trabajo, Ley Núm 45, se le otorgó: el pago de los salarios y beneficios marginales desde la fecha de su despido hasta su restitución, incluyendo los aumentos a los cuales éste se le hubiese concedido de haber estado trabajando para la parte demandada durante dicho periodo, en adición a la doble penalidad que estatutariamente se dispone procedente en estos casos. Se le solicitó a la parte demandada proveer en un término de diez (10) días la información relativa a los aumentos.

b) En cuanto a la reclamación en daños bajo el artículo 1802, se concedió la cuantía de $ 50,000 por concepto de daños morales y angustias mentales.

c) En cuanto a los honorarios por concepto de abogados se dispuso que en lugar de un 25%, se concedería una compensación mayor en la partida adicional al 25 % de la cuantía de la indemnización concedida al empleado. Para ello se requirió que los abogados presentaran un memorial juramentado de las horas trabajadas y la tarifa base a la cual entienden deben ser compensados.

[27] 29 L.P.R.A. sec. 133, *et seq.*

que el trabajador hubiera percibido por su trabajo en ese período con otros patronos. Se computará esta cuantía desde el 14 de febrero de 1996, fecha de su despido, hasta el 3 de octubre de 2003, fecha en que el Tribunal de Primera Instancia dictó su sentencia.

En cuanto a la cantidad adicional concedida por honorarios de abogado, se modifica la determinación de dicho foro, a los fines de conceder la cantidad de 25% de la indemnización básica otorgada al empleado.

Devolvemos el presente caso al Tribunal de Primera Instancia para que continúen los procedimientos de conformidad con lo aquí pautado.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. "El Juez Presidente señor Hernández Denton disiente de la Sentencia del Tribunal por entender que la decisión del Tribunal de Apelaciones está esencialmente correcta. Coincide con dicho foro de que en las circunstancias particulares de este caso el Sr. Herberto Morales no tenía derecho a un acomodo razonable a tenor con la Ley del American with Dissabilities Act, ni de la legislación que protege contra el despido injustificado". El Juez Asociado señor Rivera Pérez emite Opinión de Conformidad. La Jueza Asociada señora Rodríguez Rodríguez disiente sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Heberto Morales Bengochea

      Peticionario

                                CC-2006-232

      v.

Banco Popular de Puerto Rico

      Recurrido


Opinión de Conformidad emitida por el Juez Asociado señor Rivera Pérez a la cual se une el Juez Asociado señor Rebollo López.


San Juan, Puerto Rico, a 7 de mayo de 2008.

La acción incoada por el señor Morales ante el Tribunal de Primera Instancia contra su patrono el BPPR, fue originalmente desestimada mediante sentencia sumaria. Correctamente, el Tribunal de Apelaciones revocó la sentencia apelada y estableció la existencia de controversias que ameritaban la celebración de un juicio plenario.

El Tribunal de Primera Instancia celebró el juicio según lo ordenado por el foro apelativo. Para ello, limitó la prueba a las controversias

señaladas por el Tribunal de Apelaciones del modo siguiente:

a) En lo que respecta a la Ley Núm.45, *supra*, si el señor Morales cumplía o no, con el requisito establecido en el artículo 5(a) referente a la necesidad de que al solicitar el empleado esté física y mentalmente capacitado para desempeñar las funciones que ocupaba antes de accidentarse.

b) En cuanto a las causas de acción al amparo de la Ley Núm. 44, *supra*, y la Ley ADA, *supra*, la prueba versó sobre tres aspectos, si el señor Morales tenía o no el derecho a acomodo razonable, si existían posiciones vacantes que éste podía haber desempeñado y si el BPPR estaba en posición de brindar dicho acomodo razonable.

c) Finalmente, si en efecto, el despido del señor Morales, fue uno justificado conforme a lo establecido en la Ley Núm. 80, *supra*.

Presentados los alegatos correspondientes por las partes y desfilada la prueba, el foro primario determinó que, el señor Morales estableció mediante prueba <u>documental y testifical</u> la existencia *prima facie* de un impedimento sujeto a acomodo razonable. De este modo, dictó sentencia mediante la cual resolvió que el BPPR violó las disposiciones de la Ley Núm.44, *supra*, y la Ley ADA, *supra*. Concluyó además que, el BPPR no probó la

existencia de justa causa para el despido por lo que se configuró un despido contrario a la Ley Núm.80, *supra* y a la Ley de Compensaciones por Accidentes de Trabajo, Ley Núm 45,*supra*.   Asimismo declaró ha lugar la acción de daños y perjuicios a tenor con lo dispuesto en el Artículo 1802 del Código Civil por violación a legislación especial y violación al derecho de intimidad.

No obstante, el BPPR apeló dicha sentencia ante el Tribunal de Apelaciones quien revocó el dictamen del foro primario y desestimó todas las causas de acción por el fundamento de que la conducta del señor Morales fue una de insubordinación y abandono de empleo, lo que constituyó justa causa para su despido.

Contando con el beneficio de prueba transcrita evaluamos cada una de las causas de acción incoadas por el señor Morales.

A

En primer lugar examinaremos la acción incoada al amparo de la Ley Núm 45, *supra*, a los efectos de determinar si el BPPR violentó las disposiciones establecidas en el artículo 5(a) de dicho estatuto.

La Ley de Compensaciones por Accidentes del Trabajo, Ley Núm.45 *supra*, es un estatuto de naturaleza remedial que pretende brindar al obrero ciertas protecciones y beneficios, particularmente en el contexto de accidentes

ocurridos en el escenario del trabajo.[28] Entre sus salvaguardas principales se destaca el artículo 5(a) que impone al patrono la obligación de reservar el empleo y reinstalar al mismo a un empleado que, haya sufrido un accidente del trabajo sujeto a las siguientes condiciones: 1) que antes de transcurrir 12 meses desde la fecha del accidente, el lesionado requiera al patrono que lo reponga en su empleo dentro del término de 15 días desde la fecha que fue dado de alta; 2) <u>que el empleado esté mental y físicamente capacitado para ocupar dicho empleo al momento de solicitar la reinstalación</u>; 3) que el empleo subsista en el momento en que el obrero o empleado solicite la reposición.[29]

En <u>Rodríguez v. Méndez & Co</u>,[30] expresamos que, para que sea de aplicación el artículo 5(a), *supra*, el obrero debe estar inhabilitado para desempeñar sus labores y su ausencia del trabajo sea recomendada o autorizada por el FSE. La protección que brinda el artículo 5(a), *supra*, es para aquellos empleados que se incapacitan temporalmente a causa de un accidente o enfermedad ocupacional y que, por ello, no pueden asistir a su lugar de empleo. Para

---

[28] <u>Suc. De Gananciales v. Royal Bank de P.R.</u>, 145 D.P.R.178 (1998).

[29] <u>Santiago v. Kodak</u>, 129 D.P.R.763(1992); <u>Torres v. Star Kist Caribe Inc</u>, 134 D.P.R. 1024 (1994). R. N. Delgado Zayas, <u>Apuntes para el estudio de la Legislación Protectora del Trabajo</u>, San Juan, Puerto Rico, 2005, págs. 191-192.

[30] <u>Rodríguez Rosa v. Méndez & Co.</u>, 147 D.P.R. 734, 739 (1999).

esos obreros, el legislador estableció el período de reserva de empleo por doce (12) meses, de manera que, cuando estuvieran aptos para incorporarse a sus labores, su trabajo estuviera disponible para ellos. La incapacidad transitoria cesará cuando el obrero sea dado de alta, ya sea <u>porque está curado o porque se reconoce una incapacidad permanente que no mejorará con tratamiento médico o quirúrgico adicional.</u>[31]

Sobre ese particular, el Reglamento Núm. 3966 de 8 de agosto de 1989,[32] en su sección 7, indica que **la determinación de dar de alta** a un trabajador ocurre cuando el Administrador, previos los dictámenes médicos rendidos en cualquier caso, llega a la conclusión de que mayor tratamiento adicional no ha de mejorar la condición del obrero o empleado, por lo cual lo procedente es darle de alta y fijar el grado de incapacidad con que haya quedado, si alguno. [33]

---

[31] <u>Torres v. Star Kist Caribe, Inc.</u>, *supra*; <u>Gámbaro Ramos v. F.S.E.</u>, 112 D.P.R. 304, 306 (1982); <u>Ríos Rivera v. Comisión Industrial</u>, 108 D.P.R. 808, 814 (1979); <u>Rivera Rivera v. Comisión Industrial</u>, 101 D.P.R. 712, 717 (1973).

[32] Dicho Reglamento fue promulgado el 10 de octubre de 1989, con el propósito de establecer de forma clara y específica los derechos que confiere la Ley de Compensaciones por Accidentes de Trabajo, Ley Núm.45,*supra*.

[33] Según explica el licenciado Ruy N. Delgado Zayas, en vista de los propósitos de la ley y de que la ley en ningún momento habla de alta definitiva, sino de "alta", resulta importante señalar que, la reserva y obligación de reinstalar es la misma para el empleado que lo dan de alta definitiva como para el que lo dan de alta con tratamiento, conocido como "CT". <u>Apuntes para el Estudio</u>

Anteriormente hemos resuelto que, tal expresión o determinación de alta, no conlleva una adjudicación por parte del FSE en el sentido que el empleado <u>está capacitado para desempeñar las funciones propias de su puesto</u>. [34]

Sin embargo, esta determinación de alta emitida por el FSE constituye evidencia **prima facie** de que el empleado se encuentra capacitado para desempeñar las funciones de su antiguo puesto.[35] Presunción, que por ser rebatible, admite prueba en contrario, es decir, el patrono puede, mediante hechos específicos y razonables, demostrar que el empleado esta inhabilitado para trabajar.[36]

Como vemos, la protección ofrecida por el artículo 5(a) al obrero no es absoluta.[37] En nuestra legislación laboral todo patrono tiene el derecho de levantar la defensa de justa causa ante un alegado despido

---

de la <u>Legislación Protectora del Trabajo</u>,San Juan, Puerto Rico, 2005,pág. 194.

Asimismo, señalamos en <u>Rivera v. Blanco Vélez Stores</u>, 155 D.P.R. 460 (2001), que un obrero en "CT" cumple con los requisitos que preceptúa el artículo 5(a), pues de otro modo no se explica como el FSE ha dado de alta para trabajar mientras recibe tratamiento.

[34] <u>Víctor Cruz González v. Pep Boys</u>, 2007 T.S.P.R. 3, 169 D.P.R.___(2007).

[35] <u>Víctor Cruz González v. Pep Boys</u>,*supra*. En esta ocasión resolvimos que esta presunción rebatible se fundamenta en que, el objetivo del tratamiento médico que el FSE ofrece al empleado lesionado, se dirige a facilitarle al empleado su recuperación y por ende, el retorno a sus labores.

[36] *Íd.*

[37] <u>Santiago v. Kodak</u>, 129 D.P.R.763 (1992).

injustificado.[38]    A estos efectos, la inhabilidad para trabajar representaría justa causa para el despido de un empleado, **salvo que proceda proveerle acomodo razonable al amparo de la Ley ADA**, *supra*, **y la Ley Núm. 44**, *supra*.[39] Se trata de una cuestión probatoria cuyo peso recae en el patrono tan pronto el empleado acredita que está autorizado para trabajar.[40]

En el presente caso, entre las defensas afirmativas, el BBPR adujo que el señor Morales, al no estar mental y físicamente capacitado para ocupar dicho empleo en la fecha en que solicitó la reinstalación, no cumplía el requisito que establece el artículo 5(a) de la Ley Núm.45, *supra*. Le asiste razón.

Surge del expediente que, el señor Morales, solicitó su reinstalación dentro del término requerido por la Ley Núm.45, *supra*, es decir, quince días contados a partir de la fecha en que es dado de alta por el FSE.

Una vez fue dado de alta por el FSE, el 12 de junio de 1995, se reportó a trabajar y se le ubicó en su puesto de pagador- receptor.  En esa fecha se le requirió además, que compareciera a un adiestramiento dirigido a los empleados del área pagador-receptor.

---

[38] La Ley Núm. 45, *supra*, no contiene una definición de lo que constituye justa causa para el despido. Es por eso que se acogen las circunstancias enumeradas en la Ley Núm. 80, *supra.*

[39] R.N. Delgado Zayas, Apuntes para el Estudio de la Legislación Protectora del Trabajo en el Derecho Laboral Puertorriqueño, San Juan, Puerto Rico, 2005, pág.192.

[40] *Íd.*

Fue el propio señor Morales, quien durante el juicio declaró que, no estaba mental ni físicamente capacitado para ejercer tales funciones. Asimismo, expresó su inconformidad con la decisión del BPPR, al ubicarlo en la posición de pagador-receptor, ya que ello resultaba contrario a las recomendaciones del FSE.[41]

Las evaluaciones médicas y ocupacionales, realizadas al señor Morales por los facultativos médicos y técnicos de rehabilitación del FSE, determinaron: … *"[l]a necesidad de **reubicar** al empleado a otro escenario, con tareas donde no esté expuesto a posibles asaltos, al manejo de valores en efectivo ni al contacto personal directo en público",*[42] *"[s]olicitamos que el caso sea evaluado a tono con los procedimientos administrativos del Banco Popular y en armonía con la legislación estatal y federal para las personas con impedimentos "*[…].[43]

Todas las evaluaciones de los médicos del señor Morales, certificaron consistentemente que éste no podía volver a trabajar como pagador-receptor, que no le convenía desempeñarse en áreas de contacto con público

---

[41] Transcripción escrita de la vista en su fondo, Testimonio del señor Heberto Morales Bengoechea, págs. 35-40.

[42] Carta suscrita por el señor Héctor Rivera Ostolaza, Especialista en Rehabilitación del FSE.

[43] Certificación emitida por el doctor Ifarraguerri, el 2 de noviembre de 1994.

directo, manejo de dinero y/o lugares que revivan la experiencia de un asalto.[44]

No obstante, la determinación de alta emitida por el FSE, recalcó que el señor Morales <u>tenía el potencial para seguir siendo productivo en el trabajo por lo que recomendó al BPPR la concesión de un acomodo razonable</u>.

Por ende, es preciso señalar que, aunque el señor Morales no estaba capacitado para ser reinstalado en el mismo puesto, sí estaba capacitado a ejercer otras funciones con acomodo razonable.

En este sentido, la propia sentencia emitida por el Tribunal de Primera Instancia expresó que, el señor Morales estableció mediante prueba documental y testifical la existencia *prima facie* de un impedimento sujeto a acomodo razonable.

La totalidad de la prueba estableció que el señor Morales, por su condición emocional **no estaba capacitado para ejercer las funciones de su puesto**. Es por ello, que estamos convencidos que la causa de acción bajo la Ley Núm. 45, *supra*, es improcedente.

Sin embargo, en vista de que el señor Morales era una persona cualificada para el trabajo, con ciertas limitaciones, examinaremos la procedencia de su reclamación al amparo de la Ley Núm.44, *supra* y la Ley ADA.

---

[44] Certificación emitida por el doctor Juan G. Soto Silva, el 20 de junio de 1995.

B

La "Americans with Disabilities Act" conocida por sus siglas ADA, fue aprobada por el Congreso de Estados Unidos el 26 de Julio de 1990. Dicho estatuto estableció la obligación a todo patrono de proveer un acomodo razonable en el lugar de trabajo a las personas con impedimentos.[45]

La Ley Núm. 44, *supra*, es su equivalente local.[46] Ambas leyes persiguen propósitos similares, proteger a las personas con impedimentos físicos o mentales, prohibir el discrimen en el empleo contra tales personas y ampliar sus oportunidades de trabajo.[47]

Luego de la aprobación de la Ley ADA, *supra*, la Asamblea Legislativa de Puerto Rico,[48] enmendó la Ley Núm. 44, *supra*, con el fin de atemperar nuestra legislación con la Ley ADA, *supra*, mediante la aprobación de la Ley Núm. 105 de 20 de diciembre de 1991.[49] En particular, dicha enmienda añadió el artículo 9 a la Ley Núm. 44, *supra*, y estableció al patrono la obligación de:

> "llevar a cabo acomodos razonables en el lugar de trabajo para asegurar que se le permita a las personas **con impedimentos cualificadas trabajar efectivamente** al

---

[45] 42 USC 12112(a).

[46] 1 L.P.R.A.505.

[47] García v. Darex P.R., 148 D.P.R. 354 (1999), 42 U.S.C 12112 (b).

[48] Ríos Jaiman v. Cidra Manufacturing Operation of Puerto Rico, 145 D.P.R. 746 (1988).

[49] 1 L.P.R.A. sec.501 *et sec.*

máximo de su productividad…". (Énfasis nuestro).

La Ley Núm. 44, *supra*, define persona con limitaciones físicas como:

> "toda persona con un <u>impedimento de naturaleza motora, mental o sensorial, que le obstaculice o limite su inicio o desempeño laboral</u>, de estudios, o para el disfrute pleno de la vida y que esta cualificada para llevar a cabo las funciones básicas de ese trabajo o área de estudio con o sin acomodo razonable."[50] (Subrayado nuestro).

> "Se entenderá además que es una persona con impedimentos, bajo la protección de este capitulo, <u>toda aquella persona cuyo impedimento le limite sustancialmente su desempeño en una o más actividades del diario vivir</u>, que la persona tenga un historial previo de esa condición, o se le considere que tiene dicho impedimento aún cuando no lo tiene." (Subrayado nuestro).

> "Para los propósitos de este Capítulo se considerará como impedimento sensorial aquel que afecte sustancialmente, la audición, visión, tacto, olfato y el habla." [51]

Por su parte la Ley ADA, *supra*, define persona con impedimentos como aquella que, con o sin acomodo razonable, puede desempeñar las funciones esenciales de su empleo. De acuerdo a la Ley ADA, *supra*, aquel empleado que cumpla con el criterio de impedimento antes mencionado tendrá derecho a que el patrono le provea <u>acomodo razonable</u> en su área de empleo.[52]

---

[50] 1 L.P.R.A. 501 (e).

[51] 1 L.P.R.A. 501 (e).

[52] 42 U.S.C. § 1211(8):

El acomodo razonable puede incluir, el proveer facilidades accesibles y disponibles para personas con impedimentos, rediseño del trabajo, modificación de horario de trabajo, reasignar a una posición vacante, y aquellos otros acomodos similares para personas con impedimentos.[53]

---

The term **"qualified individual with a disability"** means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C.A. § 12102 (2):

The term **"disability"** means, with respect to an individual

> **(A)** a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> **(B)** a record of such an impairment; or
> **(C)** being regarded as having such an impairment.

[53] 42 U.S.C. § 12111(9)(A) y (B).The term **" reasonable accomodation"** made include:

> A)making existing facilities used by employees readily accessible to and usable by individuals with disabilities and,
> B)job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipments or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar

Conforme a la Ley Núm. 44, *supra*, el acomodo razonable es el ajuste razonable que permite a una persona cualificada para el trabajo, pero con limitaciones físicas, desempeñar las labores asignadas a su puesto. El término incluye cualquier acción que razonablemente le facilite el ajuste a una persona con limitaciones físicas en su trabajo y que no representa un esfuerzo extremadamente oneroso para el patrono en términos económicos.[54]

Para estar cobijado bajo la Ley Núm. 44, *supra*, y que el patrono esté obligado a brindar acomodo razonable, el empleado tendrá que demostrar: (1) que es una persona con impedimento según lo define la ley, y (2) que está cualificado para llevar a cabo las funciones básicas de ese trabajo, con el acomodo razonable o sin éste.[55]

De igual forma, un demandante bajo la Ley ADA, *supra*, tiene la carga de demostrar que es un individuo cualificado con impedimento ("qualified individual with a disability"), pero que con o sin acomodo razonable puede desempeñar las funciones esenciales de su puesto.[56]

Una vez, el empleado ha formalizado una solicitud de acomodo razonable, el patrono viene obligado a iniciar un proceso interactivo con dicho empleado para analizar si

---

accommodations for individuals with disabilities"

[54] 1 L.P.R.A. 501(b).

[55] García v. Darex P.R., *supra*.

[56] Cleveland v. Policy Mgmt. Sys, 526 U.S. 795 (1999).

resulta posible conceder el remedio solicitado y la forma en que puede concederse el mismo.[57] La petición de acomodo razonable no requiere que sea por escrito o cualquier otra forma en especial, basta que el patrono advenga en conocimiento de la necesidad del empleado de un acomodo razonable.[58]

La única excepción por la cual un patrono no está obligado bajo la Ley ADA, *supra*, a realizar un acomodo razonable **es si el mismo le representa un esfuerzo extremadamente oneroso** ("*undue hardship*").[59] No obstante, la evaluación sobre, si el acomodo razonable constituye un esfuerzo extremadamente oneroso, descansa principalmente en la naturaleza y costo del acomodo necesario, los recursos financieros de la entidad, el número de empleados, y el efecto de los gastos y recursos o el impacto en las operaciones de las facilidades.[60]

Finalmente, el legislador incluyó al empleado que es objeto de discrimen por incapacidad entre las clases protegidas por la Ley Núm.100 del 30 de junio de 1959.[61] A estos efectos, la Ley Núm. 44, *supra*, en su sección 511, establece que, un empleado víctima de un despedido

---

[57] Licenciado Alberto Acevedo Colom, <u>Legislación Protectora del Trabajo comentada</u>, 285-286 7ma Edición, 2007.

[58] *Íd.*

[59] 42 U.S.C. 12111 sec. 12111 (10)(A).

[60] 42 U.S.C sec.12111 (10)(B).

[61] 20 L.P.R.A 146 *et seq.*

discriminatorio por razón de su impedimento, tiene

disponibles los remedios concedidos al amparo de la Ley

Núm.100, *supra*. Citamos:

> " El Secretario del Trabajo y Recursos Humanos velará por el cumplimiento de esta ley en todo lo concerniente al empleo en unión al Procurador de las Personas con impedientos."

> "Los remedios, facultades, autoridad y procedimientos establecidos en las secciones 146, 147, 147(a), 148, y 149 del Título 29 estarán disponibles para el Secretario del Trabajo y Recursos Humano y para cualquier persona que entienda que ha sufrido un discrimen en el empleo por razón de impedimento en violación a las disposiciones de las secciones 501 et seq. de este título." (Ley Núm 44 del 2 de julio de 1985).

La acción civil provista por la Ley Núm.100, *supra*,

establece que quien viole sus disposiciones incurrirá en

responsabilidad civil por una suma igual al doble del

importe de los daños que el acto haya causado, incluyendo

los daños emocionales.[62] La referida ley también dispone

para la imposición de honorarios de abogados al patrono.

El Tribunal de Primera Instancia determinó, entre

otras cosas, que a base de la evidencia documental

presentada se podía razonablemente concluir que el señor

Morales era una persona cualificada en el contexto de la

Ley ADA, *supra* y la Ley Núm 45, *supra*.

Acorde con la definición provista en estos casos, la

condición emocional del señor Morales constituía un

impedimento que limitaba sustancialmente su desempeño en

---

[62] García Pagán v. Shiley Caribbean,122 D.P.R.193 (1988).

una o más actividades mayores del diario vivir, tales como respirar, alimentarse, dormir.[63]

De las determinaciones de hechos del foro primario, surge que la certificación de alta con incapacidad, emitida por el FSE, recomendó la reubicación del señor Morales, decisión que el BPPR no cuestionó. Por el contrario, fue un hecho probado que la oficial de reclutamiento, la señora Chary Piñeiro, comunicó tanto al FSE como al señor Morales que precisaba de más tiempo para poder ofrecerle un acomodo razonable.[64]

Posteriormente, la señora Chary Piñeiro, le indicó al señor Morales que como no lo podían reubicar le concederían una licencia sin sueldo, sin explicarle el alcance y el efecto de la misma.

El testimonio ofrecido por la señora Chary Piñeiro, unido a la prueba documental presentada, evidenció que en la fecha para la cual el señor Morales estaba hábil para trabajar, existían tres posiciones vacantes, dos como representantes de servicios de telebanco y una de chofer. Del propio testimonio de la referida testigo, surge que éste cualificaba para la posición de representante de servicios, posición que se realizaba telefónicamente y requería conocimiento de teclado.

---

[63] Sentencia emitida por el Tribunal de Primera Instancia, Apéndice del Recurso de *Certiorari*, pág.612.

[64] El 12 de junio de 1995, el FSE dio de alta con incapacidad al señor Morales. En dicha semana, éste se presentó a trabajar, fue asignado al área de cajeros y enviado a tomar un adiestramiento para cajeros. Apéndice Q, Transcripción escrita de la vista en su fondo, pág.64.

A preguntas de la defensa, la testigo indicó que el candidato para ocupar tal posición tenía que conocer sobre técnicas de ventas y que desconocía si el señor Morales era apto para ello. Sin embargo, no se contempló la necesidad de entrevistarlo, ni de capacitarlo.

Situación similar ocurrió para la posición de chofer. La señora Chary Piñeiro adujo que no se le ofreció la posición debido a que el señor Morales no estaba disponible. No obstante, surge del expediente que, para la fecha en que se estaban evaluando los candidatos para las posiciones vacantes, el señor Morales se encontraba bajo la licencia sin sueldo. Durante dicho período no recibió invitación alguna para ser considerado a éstas posiciones vacantes o puestos de naturaleza distinta o similar.[65]

Teniendo en cuenta que la Ley ADA dispone como una alternativa para el "acomodo razonable" la reubicación en una posición vacante", el Tribunal de Primera Instancia examinó las diligencias habidas por el BPPR para cumplir con tal requisito.

Concluyó, que el BPPR no demostró haber realizado gestiones afirmativas para tratar de reubicarle ni cumplió con las disposiciones reglamentarias correspondientes a la tramitación de una solicitud de

---

[65] Estas vacantes surgen en las fechas del 19 de octubre al 26 de octubre de 1995. El señor Morales fue colocado en licencia sin sueldo desde el 12 de junio 1995 hasta el 14 de febrero de 1996, fecha en la que fue efectivo su despido.

acomodo razonable.[66] Asimismo, resolvió que conforme a la prueba desfilada y la credibilidad otorgada a los testigos, el BPPR no presentó prueba alguna que sostuviera que el señor Morales no estaba capacitado para ejercer dichas vacantes.[67]

En vista de estas actuaciones el foro primario concluyó que, el BPPR no demostró de manera fehaciente que la reubicación del señor Morales constituía un esfuerzo demasiado oneroso de manera que se le pudiese eximir del cumplimiento de esta obligación, por lo cual concluyó que el despido del señor Morales fue discriminatorio.

No obstante, el BPPR alegó que medió justa causa para el despido del señor Morales, ya que el empleado abandonó su empleo.

---

[66] Conforme al testimonio de la oficial de reclutamiento del BPPR, señora Chary Piñeiro, en los casos de empleados con impedimentos, el Departamento de Recursos Humanos mantiene un listado de las solicitudes de acomodo razonable. Dicho Departamento tiene el deber de estar atentos del surgimiento de alguna posición que éste pueda desempeñar. De este modo, de surgir una vacante, se procede a llamar al empleado de modo que este llena una solicitud. Si del expediente, no se desprende información suficiente para determinar si reúne los requisitos mínimos, se procede a llamar al empleado para que actualice su información y si, con ésta reúne los requisitos y demás condiciones, se refiere entonces, para la entrevista en el Departamento o sección que tiene la posición vacante. Transcripción escrita de la vista en su fondo, pág. 107.

[67] Determinaciones de hechos de la sentencia emitida por el Tribunal de Primera Instancia, Apéndice del Recurso de *Certiorari*, pág.612.

Es norma reiterada que no existe una prohibición absoluta para el despido de un empleado.[68] Como regla general, un patrono puede despedir a un empleado contratado sin tiempo determinado, en cualquier momento, con justa causa, o sin causa justificada. Sin embargo, si lo hace sin causa justificada, vendrá obligado, ante el reclamo del ex empleado perjudicado, a indemnizarle con la correspondiente compensación por despido injustificado que dispone el Artículo 1 de la Ley 80, *supra*.[69] De este modo, se cumple con el propósito de proteger la tenencia de empleo y desalentar la incidencia de despidos injustificados.[70]

La Ley 80, *supra*, no establece un listado de las modalidades constitutivas de despido injustificado. En su lugar, ofrece unas normas y guías que ayudan a determinar lo que constituye justa causa.[71] A estos fines, el artículo 2 de la Ley Núm. 80, *supra*, dispone como causales de despido de un empleado, las siguientes[72]:

> a) Que el obrero siga un patrón de conducta impropia o desordenada.
>
> b) La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de

---

[68] <u>Santiago v. Kodak</u>, 129 D.P.R. 763(1992).

[69] <u>Wilfredo García Burgos vs. Asoc. de Empleados del ELA</u>, 2007 TSPR 29, 170 D.P.R.____ (2007).

[70] 29 L.P.R.A. sec 185a. Véase además, R.N. Delgado Zayas, op cit, pág. 133.

[71] *Íd.*

[72] 29 L.P.R.A.. sec. 185(b).

las normas de calidad del producto que se produce o maneja por el establecimiento.

c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

d) Cierre total, temporero o parcial de las operaciones del establecimiento.

e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas, o ganancias, anticipadas o que prevalecen al ocurrir el despido.

Subsiguientemente, el referido artículo establece la base conceptual de lo que constituye "justa causa" para despedir, y citamos:

"no se considerará despido por justa causa aquel que se hace por **mero capricho** del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento".[73]

De dicho estatuto se puede colegir que, el principio rector que gobierna el despido por justa causa, es aquel que delimita las **circunstancias en que éste se produce**.[74] Así pues, se entenderá como justa causa, aquella que

---

[73] Art.2, 29 L.P.R.A. sec.185(b).

[74] Srio. del Trabajo v. G.P.Inds.,153 D.P.R.233,244(2001).

tiene su origen en <u>alguna razón o motivo vinculado a la ordenada marcha y normal funcionamiento de la empresa</u>.[75]

En adición, la jurisprudencia ha enmarcado el concepto de justa causa como aquella **fundada en las necesidades de la empresa** y que pueda ser descrita como una transacción lícita y en el curso de los negocios.[76]

Acorde con su propósito, la Ley Núm.80, *supra*, establece que, cuando el patrono interpone como defensa afirmativa haber mediado justa causa para el despido, le corresponde entonces probar, por preponderancia de prueba que el mismo estuvo justificado.[77] Esto es, probar que la no ocurrencia del hecho es más probable que su ocurrencia.[78]

Si el patrono no presenta evidencia que derrote el hecho presumido, o sea, que el empleado fue despedido sin justa causa, el Tribunal debe aceptar la existencia de

---

[75] <u>Srio. del Trabajo v. ITT</u>, 108 D.P.R.536 (1979).

[76] <u>Narváez v. Chase Manhattan Bank</u>, 120 D.P.R. 731,739, (1988), <u>Srio. del Trabajo v. I.T.T</u>, 108 D.P.R.536 (1979).

[77] El Artículo 11 de dicho estatuto dispone en lo pertinente que:
"En toda acción entablada por un empleado reclamando los beneficios dispuestos por las secs.185(a) *et seq.*, el patrono vendrá obligado a alegar, en su contestación a la demanda, **los hechos que dieron origen al despido y probar que el mismo estuvo justificado** para quedar eximido de cumplir con lo establecido en la sec.185(a)de este título."(Énfasis nuestro).

[78] <u>Ibáñez v. Molinos de P.R, Inc</u>,114 D.P.R.42 (1983).

tal hecho. Es decir, que el empleado fue despedido sin justa causa.[79]

En el presente caso, el BPPR alegó como justificación para el despido del señor Morales, el que una vez concedida la licencia sin sueldo, éste hizo caso omiso a las solicitudes requeridas sobre su estado de salud, lo que constituyó una violación a las normas generales de trabajo. El BPPR interpretó dicha actuación como un abandono de trabajo, y por ende una renuncia. Además expresó que el señor Morales mantenía una actitud impropia y desordenada.

Sin embargo, fue un hecho probado y no rebatido, que el señor Morales, una vez contrató su representación legal, comunicó al BPPR que éste sería el cauce para las siguientes comunicaciones. Constan en el expediente las cartas remitidas por su representación legal al BPPR, informando lo referente a su condición de salud y deseos de reubicación. Asimismo, se evidenció que la esposa del señor Morales se mantuvo en comunicación con el BPPR.

El Tribunal de Primera Instancia entendió que, el requerimiento de una certificación médica por ausencia era improcedente, pues éste no asistía a su trabajo por permanecer sujeto a la licencia sin sueldo que el BPPR le impuso.

No consta en el expediente de trabajo del señor Morales, evaluación negativa alguna que justifique o

---

[79] Véase además, Regla 14 de Evidencia de Puerto Rico, 32 L.P.R.A. Ap.IV, R.14.

demuestre su alegado patrón de conducta impropia y desordenada. Más aún, de haber sido ésta la razón, el BPPR pudo no haberle reinstalado una vez fue dado de alta por el FSE, y no lo hizo.

El foro primario concluyó que el BPPR no pudo justificar satisfactoriamente las razones para el despido del señor Morales, ni demostró la alegada renuncia del empleado.

Por otro lado, durante el interrogatorio a los testigos del BPPR,[80] dicho foro sentenciador se percató de que, el BPPR otorgó la licencia sin sueldo en contravención a su política institucional. Igualmente, determinó que el BPPR no cumplió con las normas contenidas en su Manual sobre Normas Generales de Empleados, las cuales contemplan una entrevista final previo a un despido.[81]

Ante estos hechos, el Tribunal de Primera Instancia, concluyó que el BPPR no demostró que el señor Morales violara alguna disposición reglamentaria del BPPR y que las actuaciones aludidas no satisfacen los criterios de razonabilidad que constituyen justa causa para su despido contenidos en el artículo 2 de la Ley Núm. 80, *supra*. No obstante, el foro intermedio apelativo revocó dicha sentencia. Discrepamos de dicho proceder.

Considerando específicamente que, en <u>esta causa de acción</u>, la fuente mayor de prueba lo fue el testimonio

---

[80] Testimonio de la señora Chary Piñeiro, Transcripción escrita de la vista en su fondo, págs. 106.-120.

[81] Manual de Empleados del BPPR, Sección XII, pág. 98. Apéndice del Recurso de *Certiorari*, pág.386.

de los testigos presentados por las partes, en ausencia de error manifiesto, pasión, prejuicio, parcialidad o circunstancias extraordinarias que surjan del expediente, procede confirmar la decisión emitida por el Tribunal de Primera Instancia.

Dicho tribunal se encuentra en una posición privilegiada para examinar, aquilatar y apreciar la prueba desfilada ante sí.[82] Por tal razón y en consideración a la oportunidad de ver y escuchar a los testigos, su apreciación merece gran respeto y deferencia. [83]

En situaciones como la presente, en las cuales la credibilidad de los testigos ha sido dirimida, el foro apelativo no debió descartar y sustituir por sus propias apreciaciones, las determinaciones ponderadas del Tribunal de Primera Instancia, máxime cuando no encontramos en el expediente evidencia documental que sostenga la posición del BPPR.

C

Por último, consideraremos la prueba presentada en cuanto a la causa de acción por daños y perjuicios al amparo del Artículo 1802 del Código Civil de Puerto Rico.[84]

El Tribunal de Primera Instancia declaró ha lugar la reclamación de daños por violación a la intimidad y por violación a la política pública contenida en la Ley Núm.

---

[82] _Pueblo v. Torres Rivera_, 137 D.P.R. 630, 640 ( 1994).

[83] _Rolón García y otros v. Charlie Car Rental_, 148 D.P.R. 420,432 (1999).

[84] 31 L.P.R.A. sec. 5141.

44, *supra*, que prohíbe el despido de personas con impedimentos.

El señor Morales basó su reclamación en daños y perjuicios en que su despido se hizo con el propósito de frustrar una clara política pública, a saber, la Ley Núm.44, *supra* y alegó además, una violación a su derecho de intimidad. No nos persuade.

Aunque una causa de acción por violación a los derechos a la intimidad, dignidad del ser humano y protección contra riesgos contra la integridad personal constituye una excepción al remedio exclusivo provisto por la Ley Núm. 80, *supra,* hemos resuelto que para probar las alegaciones de una causa de acción por violación al derecho a la intimidad originada en el contexto de una relación laboral, el reclamante debe <u>presentar prueba de</u> <u>actuaciones concretas del patrono que incidan en su vida</u> <u>íntima o familiar</u>.[85] Asimismo, el reclamante tiene que demostrar que las actuaciones del patrono son ajenas al desempeño normal en el escenario de trabajo y que las mismas constituyen ataques nocivos a su dignidad e integridad personal o familiar.[86]

En el caso ante nos, la única prueba que el señor Morales ofreció para sostener la alegada violación a su derecho de intimidad, fue el hecho de que la vicepresidenta de la División de Recursos Humanos, la

---

[85] <u>Soc. de Gananciales v. Royal Bank de P.R.</u>, 145 D.P.R.178 (1998).

[86] *Íd.*

licenciada Emily Arean, se dirigió a las oficinas del FSE para solicitar que reabrieran el caso siquiátrico de su empleado. El señor Morales alegó que, con dicha actuación se pretendió manipular su información médico confidencial con el propósito de alargar su tratamiento médico y posteriormente justificar su despido.

Surge del expediente que el FSE no accedió a la solicitud efectuada por la licenciada Emily Arean, por ser contrario al artículo 3(d) de la Ley de Compensaciones por Accidentes de Trabajo, Ley Núm.45, *supra*, el cual establece que sólo se tramitaran solicitudes de reapertura solicitadas por el lesionado.

Los hechos presentes, no nos permiten apreciar los **daños concretos** que esta actuación provocó en el señor Morales. No podemos olvidar que estamos ante una reclamación de daños a tenor con el artículo 1802 de nuestro Código Civil, *supra*, la cual como toda reclamación debe sostenerse a base de la prueba. Somos del criterio que las alegaciones aquí planteadas no son suficientes para configurar una violación a los derechos de intimidad del señor Morales.

Efraín E. Rivera Pérez
Juez Asociado